**Ouida LOCKETT Plaintiff**

v.

**WAL–MART STORES, INC. Defendant**

No. 5:03 CV 211.

United States District Court,
E.D. Texas,
Texarkana Division.

Aug. 18, 2004.

---

Ned Alexander Stewart, Jr., Autrey, Autrey & Stewart, Texarkana, TX, for Plaintiff.

Mark Douglas Temple, Littler Mendelson, Houston, TX, Scott Alan Forman, Littler Mendelson, Miami, FL, Judith Alane Colbert, Melissa Morales Fletcher, Godwin & Gruber LLP, Dallas, TX, Dionne Wilson Blake, Littler Mendelson, Miami, FL, for Defendant.

## *MEMORANDUM ORDER*

FOLSOM, District Judge.

Before the Court are Plaintiff's Motion to Strike Defendant, Wal–Mart Stores, Inc.'s Responses to Plaintiff's First Request for Admissions (Dkt. No. 20), Defendant, Wal–Mart Stores, Inc.'s Motion to Strike Plaintiff's Expert Witness for Failure to Provide an Expert Report (Dkt. No. 22), and Defendant Wal–Mart Stores, Inc.'s Motion for Summary Judgment

(Dkt. No. 27). The Court, having reviewed the relevant briefing, is of the opinion that: (1) Plaintiff's motion to strike should be **DENIED**; (2) Defendant's motion for summary judgment should be **GRANTED**; (3) Defendant's motion to strike should be **DENIED AS MOOT**; and (4) Plaintiff's above-entitled and numbered cause of action should be **DISMISSED WITH PREJUDICE**.

# I.

## FACTUAL BACKGROUND

This is an employment discrimination action by Ouida Lockett ("Plaintiff"), a black female, who was at all relevant times an employee of Wal–Mart Stores, Inc. ("Defendant"). Plaintiff seeks declaratory relief, injunctive relief, and damages pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.* ("Title VII") and 42 U.S.C. § 1981(a), (b), and (c) (§ 1981). Plaintiff alleges Defendant had an awards policy ("IPH program") in which its cashiers would receive gift certificates from Defendant if they achieved a certain pace of items per hour checked through the registers to which the cashiers were assigned. According to Plaintiff, the policy favored cashiers checking at regular, as opposed to express, registers because of the greater volume of items which would pass through such regular registers.

Specifically, Plaintiff alleges that on April 24, 2002, Defendant gave Plaintiff a written reprimand in the form of a Decision–Making Day written coaching for allegedly refusing to work as a cashier in an express register. Plaintiff asserts that she was subsequently fired on October 20, 2002, based in part if not whole, on the April 24, 2002 written reprimand. Plaintiff alleges that Defendant employed a white cashier who repeatedly complained about and objected to any effort by a supervisor to assign her to an express register, and the white cashier was never disciplined in any way by Defendant for said conduct.

# II.

## MOTIONS TO STRIKE

### A. Plaintiff's Motion to Strike

#### 1. Plaintiff's Arguments

In her motion to strike, Plaintiff seeks an Order striking Defendant's Responses to Plaintiff's First Request for Admissions. Plaintiff contends that she served her First Request for Admissions on April 6, 2004, and Defendant was obligated to answer the requests on or before May 6, 2004. Plaintiff states that when she learned Defendant had changed counsel in the case, Plaintiff faxed a copy of Plaintiff's First Request for Admissions to Defendant's new counsel. Plaintiff asserts that neither Defendant's former or current counsel sought or obtained an extension of time to answer Plaintiff's requests. Plaintiff contends that she received Defendant's responses on May 13, 2004. Plaintiff asserts that the matters on which admissions were sought were automatically deemed admitted when Defendant failed to answer the requests on or before May 6, 2004. Plaintiff further asserts that because Defendant's responses were untimely, they are of no effect and should be stricken.

#### 2. Deemed Admissions

Under the Federal Rules of Civil Procedure, if a request for admission remains unanswered, with no objection lodged, for more than thirty days after service of the request, it is deemed admitted. FED. R. CIV.P.36(a). Any matter admitted under Rule 36(a) is conclusively established. *See* FED. R. CIV.P.36(b); *see also Dukes v. South Carolina Ins. Co.*, 770 F.2d 545, 549 (5th Cir.1985).

### 3. Discussion

Defendant correctly points out in its response that Plaintiff's calculations fail to consider the mailing time allowed by the Federal Rules of Civil Procedure. Rule 6(e) provides as follows:

> Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of notice or other paper upon the party and the notice or paper is served upon the party under Rule 5(b)(2)(B), (C), or (D), 3 days shall be added to the prescribed period.

Rule 5(b)(2)(B) applies when service is made by "mailing a copy to the last known address of the person served." Here, Plaintiff served her First Requests for Admission upon Defendant by United States mail. Thus, Rule 6(e) allows Defendant three additional "mailing days" in computing the deadline to respond. Therefore, Defendant's responses were due thirty-three days from the date of service on Sunday, May 9, 2004. *See Eber v. Harris County Hospital District*, 130 F.Supp.2d 847, 853–54 (S.D.Tex.2001).

■ Rule 6 further provides that if the deadline falls on a Sunday, the period runs until the end of the next business day. *See* FED.R.CIV.P.6(a). As such, Defendant's responses were due on May 10, 2003. Defendant timely served its responses on May 10, 2004. Even assuming that Defendant's responses were untimely by one or more days, the Court would not be inclined to strike Defendant's responses because Plaintiff has not evidenced any prejudice sufficient to permit admission of the requests. *See Hadra v. Herman Blum Consulting Engineers*, 74 F.R.D. 113, 114 (N.D.Tex.1977). For these reasons, Plaintiff's motion to strike is **DENIED**.

### B. Defendant's Motion to Strike

In its motion to strike, Defendant moves, pursuant to Rule 37 of the Federal Rules of Civil Procedure, to strike Plaintiff's expert witness for failure to provide an expert report. Defendant states that on a few occasions prior to Plaintiff's discharge from employment, Plaintiff was treated by Dr. Timothy Overlock. According to Defendant, approximately one (1) year after her last visit with Dr. Overlock, Plaintiff filed this lawsuit. During discovery, Plaintiff identified Dr. Overlock as an expert witness who would testify on her behalf in the trial of this action.

Defendant asserts that it has repeatedly asked Plaintiff to provide Dr. Overlock's expert report pursuant to FED. R. CIV. P.26(a)(2)(B). Defendant asserts that Plaintiff has not provided the required report nor the information sought in the report. Therefore, Defendant moves to strike Dr. Overlock as an expert witness and to preclude him from testifying as an expert at trial. Based on the Court's ruling on Defendant's motion for summary judgment, this motion is **DENIED AS MOOT**.

### III.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In its Motion for Summary Judgment, Defendant seeks dismissal of Plaintiff's race discrimination claims under Title VII and § 1981 because Plaintiff cannot establish a *prima facie* case of discrimination. Defendant asserts that Plaintiff cannot demonstrate that she was treated less favorably than a similarly situated white employee. Even if Plaintiff establishes a *prima facie* case, Defendant contends that it has articulated a legitimate, nondiscriminatory reason for Plaintiff's discharge, namely, that Plaintiff refused to follow an ex-

press directive of her supervisor. Finally, Defendant asserts that Plaintiff is unable to establish Defendant's articulated reason for the termination is pretext for race discrimination.

## IV.

### SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV.P.56(c). The movant bears the responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Topalian v. Ehrman*, 954 F.2d 1125 (5th Cir.1992). *cert. denied*, 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46 (1992).

The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial. *Ashe v. Corley*, 992 F.2d 540 (5th Cir.1993). Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial. FED. R. CIV.P. 56(e). It is not enough for the party opposing summary judgment to rest on mere conclusory allegations or denials in his pleadings. *Topalian*, 954 F.2d at 1131. The nonmovant must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case. *Dunn v. State Farm & Casualty Co.*, 927 F.2d 869, 872 (5th Cir.

1991). If the nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2551, 91 L.Ed.2d 265 (1986). In assessing the proof, the court views the evidence in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## V.

### APPLICABLE LAW

When 42 U.S.C. § 1981 and Title VII are alleged as parallel bases of relief, the same elements of proof are required for both actions. *See Flanagan v. Aaron E. Henry Community Health Servs. Center*, 876 F.2d 1231, 1233–34 (5th Cir.1989). In cases arising under 42 U.S.C. § 1981, the plaintiff must prove discriminatory intent. *Crawford v. W. Elec. Co., Inc.*, 614 F.2d 1300, 1309 (5th Cir.1980). Title VII requires no such showing. *Mason v. United Air Lines, Inc.*, 274 F.3d 314, 318 (5th Cir.2001).

A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. The Supreme Court established the analytical framework for addressing Title VII race discrimination claims based on circumstantial evidence in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Rutherford v. Harris County, Texas*, 197 F.3d 173, 179–80 (5th Cir.1999). Under the burden-shifting framework of *McDonnell Douglas*, a plaintiff must first present a *prima facie* case of discrimination.

In order to show a *prima facie* case of discriminatory discharge, a plaintiff must first establish that she (1) is a member of a protected class. (2) was subject to an ad-

verse employment action, (3) was qualified for her position, and (4) was replaced by someone outside the protected class, or, in the case of disparate treatment, that others similarly situated were treated more favorably than her. *Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 404 (5th Cir.1999); *see also Rutherford v. Harris County, Texas,* 197 F.3d 173, 184 (5th Cir.1999). If the plaintiff is successful in establishing a *prima facie* case of discrimination, the employer must rebut the presumption of discrimination by articulating a legitimate, nondiscriminatory reason for the adverse employment action.

If the employer presents such evidence of pretext, then the burden shifts back to the plaintiff to present substantial evidence that the employer's reason was pretext. *Auguster v. Vermilion Parish Sch. Bd.,* 249 F.3d 400, 402 (5th Cir.2001). If the plaintiff can show that the proffered explanation is mere pretext, that showing coupled with the *prima facie* case, will be sufficient to survive summary judgment in most cases. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 146–48, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). A plaintiff may establish pretext "by showing that a discriminatory motive more likely motivated" her employer's decision, such as through evidence of disparate treatment, "or that [her employer's] explanation is unworthy of credence." *Deffenbaugh–Williams v. Wal–Mart Stores, Inc.,* 156 F.3d 581, 589 (5th Cir.1998)(quotations and citations omitted), *vacated by* 169 F.3d 215 (1999), *reinstated in pertinent part by* 182 F.3d 333 (1999).

## VI.

### THE SUMMARY JUDGMENT EVIDENCE

**A. Defendant's Summary Judgment Evidence**

Defendant attaches the following in support of its motion for summary judgment:

(1) Excerpts from Plaintiff's Deposition; (2) Sworn Declaration of Jerry Clark; (3) Excerpts from Jeanette Thomas' Deposition; (4) Excerpts from Linda Baker's Deposition; (5) Excerpts from Rebecca Terry's Deposition; (6) Excerpts from Stacy Henderson's Deposition; (7) Coaching for Improvement Form; and (8) Exit Interview. The summary judgment evidence, attached by Defendant to its motion, establishes the following.

In April of 2001, Plaintiff interviewed with Assistant Manager Calvette Boyd for a part-time position in the shoe department in Wal–Mart's Atlanta, Texas store. On April 18, 2001, Plaintiff was hired for the part-time position. (Plaintiff's Depo. at pg. 54, line 11–pg. 55, line 1). The Store Manager throughout Plaintiff's employment, Jerry Clark, approved Plaintiff's hire. (Clark Decl. at ¶¶ 3–4)(Thomas Depo. at pg. 20, lines 6–12). During this period, Plaintiff worked another part-time position with another company. For months after Plaintiff's hire. Clark approached Plaintiff and offered her full-time employment. (Plaintiff's Depo. at pgs. 56 & 58–60). Plaintiff accepted the full-time position, and one month later, she began to work as a cashier. (*Id.* at pg. 61, lines 18–25).

As a cashier, Plaintiff reported to the Customer Service Managers ("CSMs"). (*Id.* at pg. 66, line 7—pg. 67, line 2). Jeanette Thomas (African American), Linda Baker (Caucasian), Stacy Henderson (African American), and Rebecca Terry (Caucasian), among others, were CSMs in the Atlanta, Texas store during Plaintiff's employ. (*Id.* at pg. 64, lines 22–23)(Clark Decl. at ¶ 12). The CSMs report to an Assistant Manager. (Thomas Depo. at pg. 20, line 21—pg. 21, line 3). Calvette Boyd, an African American, was one of six or seven Assistant Managers in the Atlanta, Texas store. (*Id.*). Boyd reported to the

Co–Manager, Richard Oxley (Caucasian), and the Store Manager, Jerry Clark (Caucasian). (*Id.* at pg. 17 & pg. 20, lines 12–20).

In mid-April of 2002, Plaintiff was directed by Linda Baker, a CSM, to replace a co-worker at the express register while the co-worker took her meal break. (Plaintiff's Depo. at pgs. 91–92)(Thomas Depo. at pgs. 46–47 & pg. 113, lines 18–22). Subsequently, while walking to the express register, Plaintiff questioned Thomas as to why she was directed to work the express register. (Plaintiff's Depo. at pg. 91, line 4—pg. 92, line 6 & pg. 93, lines 12—pg. 94, line 15). No one was present during the discussion, but ultimately, both Plaintiff and Thomas were standing next to the customer service podium when CSM Linda Baker approached. (*Id.* at pg. 94, lines 13–22)(Thomas Depo. at pg. 48, lines 6–16; pgs. 57–58 & pg. 103, lines 10–24)(Baker Depo. at pg. 23, lines 12–23). Baker testified that the express register is a "distance away from the CSM podium." (Baker Depo. at pg. 49, lines 1–8).

Thomas informed Baker that, rather than going to work the express register as directed, Plaintiff became unhappy and upset, started "fussing," used profane language, walked away from the registers and stood at the CSM podium, and refused to work the express register. (Plaintiff's Depo. at pgs. 93–94)(Thomas Depo. pg. 47, line 2—pg. 48, line 16; pg. 55, lines 18–19; pg. 57, line 11—pg. 58, line 23 & pgs. 101–04)(Baker Depo. at pg. 19; pg. 23, line 4–pg. 24, line 7 & pg. 49, lines 9–22). Thomas testified that Plaintiff insisted that unless she was permitted to work at a regular register, she would go home. (Thomas Depo. at pg. 103, line 20—pg. 104, line 2). Thomas testified that she believed Plaintiff was refusing to follow her directive. (*Id.*).

Baker, as a CSM, did not have the authority to send Plaintiff home or take disciplinary action against Plaintiff. CSMs are hourly supervisors; they are not members of Management; and they do not have the authority to coach or discipline an employee. (Thomas Depo. at pg. 28, lines 7–23 & pg. 104, lines 20–25)(Baker Depo. at pg. 16, lines 23–25; pg. 29, lines 13–15; pg. 29, line 20—pg. 30, line 14; pg. 43 & pg. 49, lines 23–25)(Terry Depo. at pg. 17, line 24—pg. 18, line 12)(Henderson Depo. at pg. 19). Baker testified that she simply told Thomas to put Plaintiff on a "regular register." (Thomas Depo. at pgs. 58 & 104)(Baker Depo. at pg. 24, lines 8–10; pgs. 29–30 & pg. 49, lines 13–25).

Later that day, Baker reported Plaintiff to Calvette Boyd, Assistance Manager. (Baker Depo. at pgs. 32 & 42). Boyd is African–American, like Plaintiff. (Thomas Depo. at pg. 21, lines 2–3)(Baker Depo. at pg. 42, lines 18–21). Boyd's immediate reaction was that Plaintiff's behavior amounted to gross misconduct, for which she could immediately be terminated. (Baker Depo. at pgs. 32–33 & 44). However, Boyd instructed Baker to prepare a Coaching for Improvement form for Plaintiff, giving Plaintiff a Decision–Making Day,[1] rather than terminating her. (Baker Depo. at pg. 44, line 3–pg. 45, line 4). The coaching form states that Plaintiff could have been terminated as a result of her insubordination, but she was being given another chance. (Coaching for Improvement). The coaching form further states that any similar behavior in the future will result in Plaintiff's termination (*Id.*). Boyd and Baker met with Plaintiff, and

---

1. A Decision–Making Day is a paid day off, during which an employee is supposed to decide whether she is committed to being successful in her position with Defendant. If so, she is required to write a written action plan, describing the steps she will take to improve and be successful. (Plaintiff's Depo. at pgs. 102–04)(Thomas Depo. at pg. 27).

Boyd explained that Plaintiff was being given a Decision–Making Day because of her insubordinate behavior. (Plaintiff's Depo. at pgs. 98–100).

Six months later, on October 16, 2002, Plaintiff was working a cash register and preparing to go on her break. (Plaintiff's Depo. at pgs. 89 & 108–09)(Thomas Depo. at pgs. 74–76)(Terry Depo. at pgs. 22–23 & 37). The store was busy. Therefore, CSMs Rebecca Terry and Jeanette Thomas directed Plaintiff to delay her lunch break and keep her register open until a replacement cashier arrived. (Plaintiff's Depo. at pgs. 11, 113–14 & 118–19)(Thomas Depo. at pgs. 78–80)(Terry Depo. at pgs. 22–24, 29 & 40, lines 4–24). Subsequently, Thomas reported that Plaintiff began throwing a fit, banged her hands on the register table, talked "out loud" in front of customers, and proceeded to close her register. (Thomas Depo. at pgs. 86–87 & 123)(Terry Depo. at pg. 39, lines 9–25 & pg. 50, lines 19–25). Thomas is African-American, like Plaintiff. (Plaintiff's Depo. at pg. 52. lines 1–2 & pg. 64, lines 22–23).

In response to Thomas' report, Clark, the Store Manager, asked Thomas, Terry, and Henderson to prepare written statements regarding what they witnessed. (Terry Depo. at pgs. 31–32)(Clark Decl. at ¶ 12). All three statements indicate Plaintiff closed her register in contravention of her supervisor's express directive. (Id.)(Def.Ex. 2–A). After obtaining the statements, Clark met with Thomas, Plaintiff's immediate supervisor, to discuss what action she believed was appropriate for Plaintiff's misconduct. (Thomas Depo. at pgs. 94 & 120)(Clark Decl. at ¶ 15). Thomas advised Clark that she believed Plaintiff should be discharged. (Id.).

Plaintiff denied the reports, but acknowledged in her deposition that if she did what Thomas accused her of, which is to shut down her register without authorization from a CSM, that behavior would violate policy and be grounds for "automatic [sic] termination." (Plaintiff's Depo. at pgs. 122 & 141). According to Clark, Plaintiff's conduct on October 16, 2002 was insubordinate and constituted gross misconduct, which under Defendant's policy, calls for immediate termination. (Clark Decl. at ¶ 13). Clark made the decision to discharge Plaintiff for her insubordination on October 16, 2002. (Plaintiff's Depo. at pgs. 149–150)(Clark Decl. at ¶ 17)(Thomas Depo. at pg. 91, lines 6–13). Clark states that Plaintiff's conduct was grounds for her termination regardless of her prior disciplinary history. (Clark Decl. at ¶ 14). Clark further states that he would have made the same decision regardless of whether Plaintiff had previously received a decision-making day. (Clark Decl. at ¶ 17).

On October 20, 2002, Clark met with Plaintiff to terminate her employment. (Plaintiff's Depo. at pgs. 126–27 & 129–131)(Clark Decl. at ¶ 21). During the exit interview, Clark explained that the incident of October 16, 2002 was "gross misconduct," and she was ineligible for rehire.[2] However, as a favor to Plaintiff, Clark completed the paperwork in a manner that would make her eligible for rehire in six (6) months. (Plaintiff's Depo. at pg. 131)(Clark Decl. at ¶¶ 13 & 21)(Exit Interview form). Clark, the sole decision-maker regarding Plaintiff's termination, is also the individual who (1) approved Plaintiff's hire and (2) voluntarily offered Plaintiff the opportunity to go from part-time to

---

2. According to Defendant's policy, "gross misconduct" is conduct that subjects an employee to immediate termination, regardless of any prior misconduct. It also renders an employee ineligible for rehire. (Plaintiff's Depo. at pg. 141, lines 15–18)(Clark Decl. at ¶ 13)(Thomas Depo. at pg. 116, lines 13–15)(Baker Depo. at pgs. 32–34).

full-time employment. (Plaintiff's Depo. at pgs. 56 & 58–60)(Clark Decl. at ¶¶ 4 & 17).

## B. Plaintiff's Summary Judgment Evidence

Plaintiff relies on the following in support of her response to Defendant's motion: (1) Plaintiff's Affidavit; (2) Quoquise Waters' Affidavit; (3) Transcribed testimony of Virginia Berry in hearing on Plaintiff's claim for unemployment benefits; (4) Excerpts from Plaintiff's, Thomas', Baker's, Henderson's, and Terry's Depositions; (5) and briefing regarding Plaintiff's Motion to Strike Defendant's Responses to Plaintiff's First Request for Admissions. Plaintiff's summary judgment evidence shows the following.

At all relevant times, Defendant had a three step disciplinary or "coaching" policy with respect to its employees under which an employee was supposed to receive a verbal warning or coaching for the first disciplinary infraction, a written warning or coaching for the second disciplinary infraction, and a Decision–Making Day ("D–Day") written warning or coaching for the third disciplinary infraction. (Baker Depo. at pg. 34, lines 5–10)(Thomas Depo. at pgs. 27–28). If an employee has more problems after he/she receives a D–Day coaching, the employee is generally subject to termination. (Thomas Depo. at 27, lines 7–10). When an employee receives a D–Day coaching, the employee is to be sent home with pay for a day and upon the employee's return to work, the employee submits a written statement (action plan) stating what the employee is going to do to improve his/her behavior. (Id. at pg. 27, lines 13–17). It was the practice at Defendant's Atlanta store for the Assistant Managers to go either to the Store Manager or Store Co–Manager on D–Day coachings. (Terry Depo. at pg. 19). Richard Oxley, a white male, was Co–Manager of Defendant's Atlanta store at all times relevant to this action. (Thomas Depo. at pg. 20, lines 15–20).

There was a program in place in Defendant's Atlanta store for the benefit of the stores cashiers. The program was known as the Items Per Hour or IPH program (Thomas Depo. at pgs. 34–35). The cashiers could obtain up to $50.00 a month in store merchandise if they maintained a certain pace of checking items of customer merchandise through their cash registers. (Id.). Some cashiers thought there was an advantage to working a regular, as opposed to an express, register because a cashier can check more items in a given period of time at a regular register. (Terry Depo. at pg. 13, line 7—pg. 14, line 5). Normally, if a cashier worked the first half of his/her shift on an express register, the cashier would be assigned to a regular register the second half of his/her shift. The cashiers were informed of this policy. (Henderson Depo. at pgs. 11–12)(Terry Depo. at pgs. 14–15)(Baker Depo. at pg. 26).

Each cashier was assigned to a particular Customer Service Manager ("CSM") who was responsible for performing a job evaluation of the cashier. A cashier's CSM was designated as the cashier's hourly supervisor. (Thomas Depo. at pgs. 30 & 59). All CSMs had the same authority, but the cashier's CSM hourly supervisor had somewhat more authority over the cashier than other CSMs. (Id. at pg. 59, lines 9–18). While CSMs at the Atlanta store cannot, without the approval of Management, coach a subordinate hourly employee, the CSMs can and frequently do initiate the coaching of a cashier. (Waters' Aff. at ¶ 5).

Plaintiff had never had any disciplinary or coaching action taken against her until April 24, 2002. (Plaintiff's Aff. at ¶ 2). On April 24, 2002, Plaintiff was given a D–Day coaching arising out an incident that oc-

curred on April 14, 2002, involving Jeanette Thomas and Linda Baker. Baker, a white female, was Plaintiff's hourly supervisor. (Coaching for Improvement Form attached to Defendant's motion). On April 14, 2002, Plaintiff had worked the first half of her shift on an express register, had gone to lunch, and had been assigned to work register 6, a regular register upon her return from lunch, Plaintiff testifies as follows:

> I had went to lunch and I came back—I had worked the express register. I went to lunch, came back from lunch, and they put me on register 6 [regular register]. I stayed on register 6 about twenty minutes, if twenty minutes, and I recall Linda Baker coming over there and telling me to go to register 20 [express register]. Jeanette was coming from customer service desk and I was going toward register 20. She asked me where I was going to and I told her to register 20. I said, why am I staying on express lanes all the day. I said, I thought in our meeting they told us to, we were going to be rotated from express as register to a regular register. Are we not going by that or what? And she was going over to the podium. She said come over here and let me look at the flow chart. And as we got over there she said, register 20 needs lunch. And I said, I've been on the express lanes all day. That's when she told Linda, she say, Linda, Ouida been on the express lanes all day. And she told Linda that I refused, but I only asked her why I was going to the express lane. And I—Miss Linda said, put her back on 6 and get someone else to go down there if she's been on the express lanes all day. That was the end of it. Until about, I guess—it was a while before—it was some days before they gave me this after that happened.

(Plaintiff's Depo. at pg. 91, line 9–pg. 92, line 6). Plaintiff explained to Baker that she did not refuse to go to register 20. She just "asked a question . . . because that was brought up in [the] cashier meeting and [she] just wanted to know." Plaintiff just wanted to bring it to Baker's and Thomas' attention that she had been on the express lane. (*Id.* at pg. 95, lines 1–7).

On the night of April 14, 2002, Baker told Calvette Boyd, an Assistant Manager, about the incident. (Baker Depo. at pg. 32). Baker did not recommend that Plaintiff be coached over the incident, did not know who made the decision to give Plaintiff a D–Day coaching, and was never consulted about the D–Day coaching. (*Id.* at pg. 30). On April 24, 2002, Plaintiff met with Boyd and Baker in a private room in the store. (Plaintiff's Depo. at pgs. 97–98). When Plaintiff entered the room, she was handed a Coaching for Improvement Form stating she was receiving a step 3 D–Day coaching over the incident ten days earlier. The form was signed by Boyd, Baker, and Richard Oxley. (Coaching for Improvement form attached to Defendant's motion). Oxley was not present at the meeting. (Plaintiff's Depo. at pg. 98, lines 14–15). Boyd asked Plaintiff what happened on April 14, 2002. (Plaintiff's Depo. at pg. 99, line 1). Plaintiff denied she had done what the coaching form stated. Boyd then stated that is not what Thomas told her. (Plaintiff's Depo. at pg. 100). Plaintiff was asked to sign the coaching form, which she did after writing the following on the form:

> I didn't do what they are saying. I just ask why I had to go to all the slow. reg. And she told me that she didn't and she didn't realize that.

(Plaintiff's Depo. at pg. 101)(Coaching for Improvement Form attached to Defendant's motion).

The Coaching for Improvement Form directed Plaintiff to prepare and submit an action plan for improvement when she returned to work. (*Id.*). Plaintiff submitted

her plan to Oxley. (Plaintiff's Depo. at pg. 104). In the plan Plaintiff initially submitted, Plaintiff told her version of the events of April 14, 2002, including her denial that she refused to go to register 20. (*Id.* at pgs. 105–106). Oxley refused to approve Plaintiff's initial plan, tore it up, and directed Plaintiff to write another plan omitting any reference to her version of the events of April 14, 2002. (*Id.* at pgs. 104–106). Plaintiff subsequently rewrote the plan. (*Id.* at pgs. 106–107). Plaintiff was then allowed to return to work. (*Id.* at pg. 107, lines 12–17).

Plaintiff was fired on October 20, 2002. Plaintiff was informed of her firing at an exit interview with Virginia Berry, a white Assistant Manager, and Jerry Clark, the Store Manager. (*Id.* at pg. 125). The Exit Interview form provides Plaintiff was fired for "Misconduct w/ Coachings" and was signed by Plaintiff, Thomas, Berry, and Clark. (Exit Interview attached to Defendant's motion). Plaintiff asserts it is "undisputed that Plaintiff would not have been fired by Defendant on October 20, 2002, if she had not received a D–Day coaching on April 20, 2002. (See Plaintiff's Motion to Strike Defendant, Wal–Mart Stores. Inc.'s, Responses to Plaintiff's First Request for Admissions filed herein on May 17, 2004, and Plaintiff's Reply to Defendant. Wal–Mart Stores, Inc.'s Response in Opposition to Plaintiff's Motion to Strike Defendant Wal–Mart Stores, Inc.'s Responses to Plaintiff's First Request for Admissions filed herein on June 7, 2004; see also Berry testimony pp. 9–10)" [3]

# VII.

# BURDEN–SHIFTING ANALYSIS

## A. *Prima Facie* Case

First, it is important to note that Plaintiff does not claim that the IPH program or the rotation of the cashiers is done in a discriminatory manner.[4] Instead, Plaintiff contends that her firing on October 20, 2002, constituted disparate treatment based on her race because Defendant treated a white employee similarly situated to Plaintiff in a more favorable manner than Plaintiff. For her *prima facie* case of disparate treatment, Plaintiff relies on the following: (1) she is a member of a protected class (African–American); (2) she was qualified for her position (she worked as a cashier for over a year without complaint by Defendant); and (3) she suffered an adverse employment action (she was fired on October 20, 2002). Plaintiff has satisfied the first three requirements of her *prima facie* case.

In order to establish the fourth requirement, Plaintiff must present evidence that another similarly situated employee was treated more favorably than her. Plaintiff must show Defendant gave preferential treatment to another employee under "nearly identical circumstances;" that is, that the *misconduct* for which the plaintiff was discharged was nearly identical to that engaged in by other employees. *See Okoye v. The University of Texas Houston Health Science Center*, 245 F.3d 507, 514 (5th Cir.2001)(Emphasis added).

---

**3.** Plaintiff's response at pg. 8.

**4.** Plaintiff testified that it did not matter to what register she was assigned, regular or express. (Plaintiff's Depo. at pg. 81, lines 15–23). In addition, Plaintiff testified that she does not have any evidence or reason to believe that there was any type of racial discrim-ination in terms of who received gift cards through the IPH program. (*Id.* at pg. 85, lines 19–24). Even if Plaintiff were claiming the IPH program itself was discriminatory, the Court doubts that the implementation of the program constitutes an adverse employment action.

The only evidence of preferential treatment in the record is Plaintiff's testimony regarding Brenda Hunt, a white female, who also worked as a cashier at Defendant's Atlanta store. According to Henderson and Thomas, Hunt disliked working express registers because she felt it would put her at a disadvantage under Defendant's IPH program. Hunt would complaint when assigned to work an express register. Her complaints in this regard were well known throughout the store. (Henderson Depo. at pgs. 12–16)(Thomas Depo. at pgs. 67–69).

On March 22, 2002, Quoquise Waters, Hunt's then CSM hourly supervisor, discussed Hunt with Oxley as part of Waters' job duty of evaluating the job performance of Hunt. (Waters' Aff. at ¶ 3). Waters advised Oxley that she had received a number of complaints on Hunt from other CSMs related to Hunt's dislike of being assigned to work express registers at the store. (Id.). "Hunt felt like working express registers put her at a disadvantage in the Items Per Hour program at the store whereby Cashiers could obtain gift certificates for merchandise from the store if they maintained a certain pace of checking items through their registers." (Id.). Each time Hunt was assigned to work an express register, Hunt would complaint about the assignment "so vigorously" that many of the CSMs would not assign Hunt to an express register "simply to avoid her wrath." (Id.). This caused problems with other cashiers who were not exempted from such assignments. (Id.).

Waters recommended to Oxley that Hunt be given a "meets expectations" rather than an "exceeds expectations" rating on Hunt's 2002 evaluation because of her conduct in vigorously complaining every time she was assigned to an express register. (Id.). Oxley declined to accept Waters' recommended evaluation rating and directed Waters to give Hunt an "ex-ceeds expectations" rating on Hunt's 2002 evaluation. (Id. at ¶ 4).

Based on the testimony of Henderson, Thomas, and Waters regarding Hunt, the Court will assume, for purposes of this motion, that Plaintiff has presented a *prima facie* case of discrimination.

## B. Legitimate, Non-discriminatory Reason

Defendant must set forth, "through the introduction of admissible evidence, reasons for its actions which, 'if believed by the trier of fact,' would support a finding that unlawful discrimination was not the cause of the employment action." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 966 (5th Cir.1999), *citing St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The evidence attached by Defendant to its motion provides as follows.

In April of 2002, Plaintiff was directed by Baker, a CSM, to replace a co-worker at an express register. Subsequently, while walking to the express register, Plaintiff questioned Thomas as to why she was directed to work the express register. Thomas informed Baker that, rather than going to work the express register as directed, Plaintiff became unhappy and upset, started "fussing," used profane language, walked away from the registers and stood at the CSM podium, and refused to work the express register. Thomas testified that Plaintiff insisted that unless she was permitted to work at a regular register, she would go home. Thomas further testified that she believed Plaintiff was refusing to follow her directive.

Later that day, Baker reported Plaintiff to Calvette Boyd, Assistance Manager. Boyd's immediate reaction was that Plaintiff's behavior amounted to gross misconduct, for which she could immediately be terminated. However, Boyd instructed

Baker to prepare a Coaching for Improvement form for Plaintiff, giving Plaintiff a D–Day, rather than terminating her. The coaching form states that Plaintiff could have been terminated as a result of her insubordination, but she was being given another chance. The coaching form further states that any similar behavior in the future will result in Plaintiff's termination (*Id.*).

Six months later, on October 16, 2002, Plaintiff was working a cash register and preparing to go on her break. CSMs, Terry and Thomas, directed Plaintiff to delay her lunch break and keep her register open until a replacement cashier arrived. Subsequently, Thomas reported that Plaintiff began throwing a fit, banged her hands on the register table, talked loudly in front of customers, and proceeded to close her register. In response to Thomas' report, Clark, the Store Manager, asked Thomas, Terry, and Henderson to prepare written statements regarding what they witnessed. All three statements indicate Plaintiff closed her register in contravention of her supervisor's express directive. (*Id.*)(Def.Ex. 2–A).

Subsequently, Clark made the decision to discharge Plaintiff for her insubordination on October 16, 2002. (Plaintiff's Depo. at pgs. 149–150)(Clark Decl. at ¶ 17)(Thomas Depo. at pg. 91. lines 6–13). Clark states Plaintiff's conduct was grounds for her termination regardless of her prior disciplinary history. (*Id.* at ¶ 14). Clark states he would have made the same decision regardless of whether Plaintiff had previously received a decision-making day. (Clark Decl. at ¶ 17).

■ Defendant has met its burden of production [5] by offering evidence that Plaintiff was terminated for her refusal to follow the directives of a CSM, including Thomas. In her deposition, Plaintiff states that if a CSM gives an employee a directive, the employee is supposed to follow the directive. (Plaintiff's Depo. at pg. 67, lines 3–5). In addition, Plaintiff acknowledged that if she had done what Thomas accused her of, which is to shut down her register without authorization from a CSM, that behavior would violate Defendant's policy and be grounds for "automatically termination." (Plaintiff's Depo. at pgs. 122 & 141). Defendant has met its burden of producing a legitimate, nondiscriminatory reason for its action.

## C. Pretext

Plaintiff must raise a genuine issue of material fact that Defendant discriminated against her because of her race. Plaintiff may meet this threshold by proving an issue of material fact exists by demonstrating that Defendant's proffered reason is a pretext for discrimination. *Okoye,* 245 F.3d at 513. A plaintiff's *prima facie* case, combined with sufficient evidence to find the employer's asserted reason is false, may be sufficient to infer discrimination. *Id.,quoting Reeves,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The Supreme Court has made clear "instances [exist] where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Id.*

■ First, relying on her motion to strike Defendant's responses to Plaintiff's First Request for Admissions and Virginia Berry's testimony, Plaintiff insists that it is "undisputed that Plaintiff would not have been fired by Defendant on October 20, 2002, if she had not received a D–Day

---

5. The burden on the defendant is one of production, and not of persuasion. The burden of persuasion remains at all times with the plaintiff. *Munoz v. Orr,* 200 F.3d 291, 299 (5th Cir.2000).

coaching on April 20, 2002." [6] The Court disagrees with this statement. Berry testified that perhaps Plaintiff would not have been terminated but for her prior D–Day. (Berry Depo. at pgs. 9–10). However, Berry made clear that Jerry Clark, not she, made the decision to terminate Plaintiff. (*Id.* at pg. 7). Defendant presented additional summary judgment evidence, namely Clark's Declaration, indicating Clark alone made the decision to discharge Plaintiff, and he would have terminated Plaintiff's employment on October 20, 2002 regardless of the fact that Plaintiff received a D–Day six months prior for engaging in the same insubordination. (Clark Decl. at ¶¶ 9, 17).

Next, Plaintiff relies on the testimony of Henderson, Thomas, and Waters to establish disparate treatment. However, Plaintiff fails to show that Hunt, a white cashier, was treated more favorably "under 'nearly identical' circumstances." *Okoye,* 245 F.3d at 514. In this regard, Plaintiff asserts that she at all times disputed Thomas' accusations that she refused to work the express register in April of 2002. Even though Plaintiff presented evidence that she consistently denied the incident of refusing to work an express register, the summary judgment evidence, when viewed in the light most favorable to Plaintiff, still shows that it was *reported to Management* that Plaintiff refused to follow the express directives of her supervisors. On the other hand, Waters' testified that Hunt *vigorously complained* of having to work the express registers, not that she ever *refused* to follow an express directive of her supervisor. Similarly, Henderson testified that she had never heard anyone say that Hunt refused to work an express register. (Henderson Depo. at pg. 14, lines 12–24).

The issue is not whether Plaintiff actually engaged in the "gross misconduct," but whether Defendant believed in good faith

that she did. Thomas, a person the same race as Plaintiff, reported to Baker that Plaintiff refused to follow her directive. Baker relayed the information to Boyd, who like Thomas is the same race as Plaintiff. Boyd advised Baker that Plaintiff's conduct constituted gross misconduct, and Plaintiff could be terminated. However, Boyd and Oxley gave Plaintiff a D–Day coaching instead. Plaintiff contends that Oxley would not consider her side of the story.

Such an argument does not lessen Defendant's legitimate, nondiscriminatory reason for terminating Plaintiff's employment. The Fifth Circuit has held:

> Even an incorrect belief that an employee's performance is inadequate constitutes a legitimate, nondiscriminatory reason. We do not try in court the validity of good faith beliefs as to an employee's competence. Motive is the issue... [A] dispute in the evidence concerning ... job performance does not provide a sufficient basis for a reasonable factfinder to infer that [the] proffered justification is unworthy of credence.

*Little v. Republic Refining Co.,* 924 F.2d 93, 97 (5th Cir.1991). Additionally, as stated above, Clark would have terminated Plaintiff solely based on the October insubordination.

Even if the Court considers Hunt's *complaints* similar to Plaintiff's reported *refusal,* there is no evidence in the record that Hunt engaged in insubordination subsequent to and in addition to those complaints. There is no evidence that Clark or Oxley was told that Hunt or any other employee refused to follow a directive of a supervisor. The Court cannot say that Plaintiff and Hunt were "similarly situated employees," and that Hunt was treated more favorably than Plaintiff. Plaintiff

---

**6.** Plaintiff's response at pg. 8.

must show, and has not shown for the reasons stated above, that Defendant gave preferential treatment to Hunt under "nearly identical circumstances;" that is, that the *misconduct* for which Plaintiff was discharged was nearly identical to that engaged in Hunt. *Okoye*, 245 F.3d at 514.

Finally, the Court notes that Plaintiff's pretext arguments are further weakened by the "same actor" inference in that Clark both approved Plaintiff's hire, promoted Plaintiff, and subsequently terminated Plaintiff. The "same actor" doctrine was first articulated by the Fifth Circuit in *Brown v. CSC Logic, Inc.*, 82 F.3d 651, 658 (5th Cir.1996). In that case, the Fifth Circuit adopted the Fourth Circuit's decision in *Proud v. Stone*, 945 F.2d 796, 797–98 (4th Cir.1991), that when the same supervisory employee hires and fires a plaintiff within a short period of time, "a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer." *Id.* If a plaintiff was hired and fired by the same individual, it gives rise to such an inference because it is illogical that a decision maker would "hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." *Brown*, 82 F.3d at 658. "The relevance of the fact that the employee was hired and fired by the same person within a relatively short time span comes in at the third stage of the analysis." *Proud*, 945 F.2d at 798. While the same-actor hiring and firing may not automatically dispose of a plaintiff's discrimination claim, it creates a strong inference that discrimination was not a determining factor. *Brown*, 82 F.3d at 658.

## VIII.

### CONCLUSION

The Court, having viewed the evidence in the light most favorable to Plaintiff,

holds Plaintiff has failed to meet her burden of showing Defendant's asserted reason for Plaintiff's discharge was pretext. Therefore, Plaintiff's Title VII claim must be dismissed. Claims of discrimination brought under Title VII and § 1981 require the same proof to establish liability. *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 422 n. 1 (5th Cir.2000). Therefore, since Plaintiff's Title VII claim fails, and because Plaintiff has failed to prove discriminatory intent, Plaintiff's § 1981 claim must also be dismissed. *See Crawford v. W. Elec. Co., Inc.*, 614 F.2d 1300, 1309 (5th Cir.1980). Based on the foregoing, it is

**ORDERED** that Plaintiff's Motion to Strike Defendant, Wal–Mart Stores, Inc.'s Responses to Plaintiff's First Request for Admissions (Dkt. No. 20) is hereby **DENIED**. It is further

**ORDERED** that Defendant's Motion for Summary Judgment (Dkt. No. 27) is hereby **GRANTED**. It is further

**ORDERED** that Defendant, Wal–Mart Stores, Inc.'s Motion to Strike Plaintiff's Expert Witness for Failure to Provide an Expert Report (Dkt. No. 22) is hereby **DENIED AS MOOT**. It is further

**ORDERED** that Plaintiff's above-entitled and numbered civil action is **DISMISSED WITH PREJUDICE.**