**LA UNION DEL PUEBLO ENTERO et al., Plaintiffs,**

v.

**FEDERAL EMERGENCY MANAGEMENT AGENCY (FEMA), Defendant.**

Civil Action No. 1:08–CV–487.

United States District Court, S.D. Texas, Brownsville Division.

Signed Sept. 30, 2015.

---

**33.** Dkt. 54 at 6.

684

Jerome W. Wesevich, Texas Riogrande Legal Aid, Inc., El Paso, TX, Emily S. Rickers, Julie M. Balovich, Robert W. Doggett, Texas Rio Grande Legal Aid Inc., Austin, TX, Edward A. Stapleton, III, Attorney at Law, Brownsville, TX, Tracy Odvody Figueroa, Texas Riogrande Legal Aid, Inc. Corpus Christi, TX, for Plaintiffs.

Carlotta Porter Wells, Caroline Lewis Wolverton, U.S. Department of Justice, Washington, DC, Nancy Lynn Masso, Office of U.S. Attorney, Brownsville, TX, for Defendant.

## MEMORANDUM OPINON AND ORDER

HILDA TAGLE, Senior District Judge.

In the early morning of July 23, 2008, Hurricane Dolly made landfall on the south Texas coast, lashing the region with fierce winds and soaking it in torrential rain.[1] The Federal Emergency Management Agency ("FEMA") received thousands of applications for disaster relief under the Robert T. Stafford Disaster Relief and Emergency Assistance Act's ("the Stafford Act") Individuals and Households Program ("IHP"), 42 U.S.C. § 5174, in the following weeks. After conducting inspections, FEMA denied approximately 50% of those applications (14,900 in all affected counties) for the stated reason that the applicants' home suffered insufficient damage. S.A.R. 2975.[2] Asserting that FEMA

---

[1]. The initial disaster declaration of July 24, 2008, determined that the following Texas counties were affected adversely: Aransas, Bexar, Brooks, Calhoun, Cameron, Hidalgo, Jim Wells, Kenedy, Kleberg, Nueces, Refugio, San Patricio, Starr, Victoria, and Willacy. 73 F.R. 45029 (Aug. 1, 2008); *See also* 73 FR 50981–01 (adding Jim Hogg County).

[2]. In this opinion, FEMA's administrative record, Dkt. No. 118–2 thru 118–11, is cited as "A.R." The Court cites Plaintiffs' supplemental administrative record filed in this case as "S.A.R." The Court considers whether and to what extent to allow supplementation *infra*, and, because the citation format is chosen for brevity, nothing should be inferred from the omission of the word "proposed" in citations to the supplemental administrative record.

did not discharge its statutory duties to disclose the standards it uses to decide requests for disaster relief and to administer those standards in an "equitable and impartial manner," Plaintiffs filed suit under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–59, 701–06. Compl. 1, Dkt. No. 1 (citation omitted). The Court has before it cross motions for summary judgment, Dkt. Nos. 118, 119–1, and Plaintiffs' motion to supplement the administrative record designated by FEMA, Dkt. No. 121.

A regulation promulgated by FEMA required compensable damage to be "disaster-related." 44 C.F.R. § 206.117(c) (2008). The administrative record includes materials used to teach a training course to inspectors who conducted Hurricane Dolly inspections. A.R. 499. Among other things, Plaintiffs, all of whose IHP applications or appeals FEMA denied, argue that portions of this document, which the Court refers to as the "deferred-maintenance policy" or "the policy" solely for consistency, are unpublished substantive rules subject to notice-and-comment rulemaking under 5 U.S.C. § 553 that FEMA could not, but did, use to affect them adversely in violation of 5 U.S.C. § 552(a)(1). The language in question concerns how to enter "deferred maintenance" into the software inspectors used to communicate inspection data to FEMA:

> Items suffering from deferred maintenance that were not significantly worsened by the disaster are not to be listed in real property line items.... Any deferred real property damage listed in line items must have been significantly worsened by the disaster event. Disaster damages to these items must be significant, obvious and without question [and] ... should never be speculative.

A.R. 504–05. FEMA contends that Plaintiffs were not adversely affected by the policy within the meaning of the APA, and, even if they were, it is an interpretative or procedural rule not subject to notice-and-comment rulemaking, see § 553(b)(A). Based on the undisputed evidence, the Court finds that the deferred-maintenance policy adversely affected Plaintiffs and, in fact, it operated as a substantive rule. Accordingly, the Court enters partial summary judgment for Plaintiffs.

I. BACKGROUND

The section of the Stafford Act authorizing the IHP provides:

> In accordance with this section, the President, in consultation with the Governor of a State, may provide financial assistance, and if necessary, direct services, to individuals and households in the State who, as a direct result of a major disaster, have necessary expenses and serious needs in cases in which the individuals and households are unable to meet such expenses or needs through other means.
>
> . . . .
>
> The President may provide financial assistance for—(i) the repair of owner-occupied private residences, utilities, and residential infrastructure (such as a private access route) damaged by a major disaster to a safe and sanitary living or functioning condition; and (ii) eligible

Plaintiffs docketed their supplemental administrative record electronically as entries 121–1 through 128. They labelled the page ranges included in each attachment but did not include page ranges for the main electronic document docketed. The page ranges for these entries are: Dkt. No. 122 (S.A.R. 2146–2297); Dkt. No. 123 (S.A.R. 3493–3559); Dkt. No. 124 (S.A.R. 4321–66); Dkt. No. 125 (S.A.R. 5209–79); Dkt. No. 126 (S.A.R. 6245–6287); Dkt. No. 127 (S.A.R. 7225–40); Dkt. No. 128 (S.A.R. 7981–8045). Also, a series of documents beginning with Dkt. No. 126–9 and continuing through Dkt. No. 127–2 have labels that do not correspond with the S.A.R. page numbers comprising the attachment.

hazard mitigation measures that reduce the likelihood of future damage to such residences, utilities, or infrastructure.

. . . .

The President shall prescribe rules and regulations to carry out this section, including criteria, standards, and procedures for determining eligibility for assistance.

42 U.S.C. § 5174(a)(1), (c)(2)(A) · and (j). FEMA promulgated interim regulations under the Stafford Act. Much, if not all, of the dispute in the pending motions surrounds FEMA's use of the term "disaster-related" in the following implementing regulation:

> Repairs to the primary residence or replacement of items must be disaster-related and must be of average quality, size, and capacity, taking into consideration the needs of the occupant. Repairs to the primary residence are limited to restoration of the dwelling to a safe and sanitary living or functioning condition . . . .

44 C.F.R. § 206.117(c)(1) (2008). The regulations also include the following definitions:

> Functional means an item or home capable of being used for its intended purpose.
>
> . . . .
>
> Safe means secure from disaster-related hazards or threats to occupants.
>
> Sanitary means free of disaster-related health hazards.
>
> Serious need means the requirement of an item, or service, that is essential to an applicant's ability to prevent, mitigate, or overcome a disaster-related hardship, injury or adverse condition.

44 C.F.R. § 206.111 (2008). Finally, FEMA's regulations give applicants 60 days to file an appeal. 44 C.F.R. 206.115 (2008). "The decision of the appellate authority is final." § 206.115(f).

## A. *Procedural History*

Plaintiffs commenced this civil action by filing their complaint and Motion for Preliminary Injunction on November 20, 2008. Dkt. Nos. 1–2. This Court entered a preliminary injunction, Dkt. No. 33, and FEMA appealed, Dkt. No. 41. On August 4, 2010, the Fifth Circuit vacated the preliminary injunction and remanded the case to this Court for further proceedings. *La Union Del Pueblo Entero v. FEMA,* 608 F.3d 217 (5th Cir.2010) (hereinafter "LUPE"). The Fifth Circuit held that Plaintiffs had not shown a substantial likelihood of success on the merits. *See id.* at 220–25. However, the panel in *LUPE* declined to address Plaintiffs' claim that they had been adversely affected by an unpublished rule, stating that the record did "not indicate that it has been definitively established that FEMA denies assistance wholly on the basis of an unpublished 'deferred maintenance' rule." *Id.* at 225.

On March 30, 2011, this Court entered a memorandum opinion and order. Dkt. No. 75.[3] Applying the Fifth Circuit's decision in *LUPE*, this court dismissed all but one of Plaintiffs' claims. *See id.* at 8–12. Finding the summary-judgment record insufficiently developed on Plaintiffs' unpublished-rules claim, *see id.* at 13–14, this Court allowed the parties to conduct discovery beyond the designated administrative record ("extra-record discovery") "at least to determine the nature of the disaster-specific guidance prepared to aid in the decision of applications for disaster-related assistance and to what degree, if at all, that guidance was used to deny applica-

---

**3.** The memorandum opinion and order entered in this case on March 30, 20 11, can be found in a commonly used database at 2011 WL 1230099. For consistency with the parties' submissions, the Court cites to the slip copy.

tions for housing repair assistance." *Id.* at 15.

FEMA moved to reconsider, Dkt. No. 81, and this Court denied that motion, Dkt. No. 86. Discovery ensued, Dkt. No. 88 at 1, and the parties moved to clarify the scope of discovery, Dkt. No. 91. This Court reiterated that it authorized discovery as set forth in the memorandum opinion and order entered March 30, 2011, explaining that the authorized scope of discovery was consistent with the Court's ruling that Plaintiffs pleaded procedural, as contrasted with individual, APA claims in their complaint. *See* Dkt. No. 96 at 1–2 (quoting Mem. Op. 15 n. 4, Mar. 30, 2011, Dkt. No. 75). After over two years, the parties completed discovery. *See* Notice of Discovery Status 1, Oct. 28, 2013, Dkt. No. 115. The parties then filed the pending motions under an extended briefing schedule. *See* Dkt. No. 109 at 2; Dkt. No. 117 at 1.

The Court has four motions before it. FEMA moves for summary judgment and has certified an administrative record. Dkt. No. 118. Plaintiffs move to supplement FEMA's administrative record. Dkt. No. 121. Plaintiffs also move for summary judgment, Dkt. No. 119–1. Because their motion exceeds the undersigned's page limits, they also seek leave to file that motion and a statement of undisputed facts. Dkt. No. 119. FEMA opposes only Plaintiffs' request to file a statement of undisputed facts. Dkt. No. 142 at 1.

After those four motions were submitted, sixteen additional plaintiffs whose individual claims were known to FEMA moved to intervene. Dkt. No. 150. FEMA did not oppose that motion, *id.* at 2, and this Court granted it. Dkt. No. 151 at 1; *compare* Compl., Dkt. No. 1 *with* Intervenor Compl., Dkt. No. 152 (asserting same claims). The intervenors sought to conduct no new discovery and joined Plaintiffs pending motions. Dkt. No. 150 at 1. Except where discussing affidavits submitted by specific plaintiffs, references to "Plaintiffs" in this opinion include the sixteen intervenors.

**B. Facts**

FEMA's administrative record and the supplemental administrative record, which the Court considers to a limited extent and for the purposes specified in Part III, establish the following facts. All Hurricane Dolly inspectors took a training or refresher course using the materials containing the deferred-maintenance policy. A.R. 279 (FEMA declaration). It is undisputed that the deferred-maintenance policy was not made available to Plaintiffs or the public before FEMA decided Hurricane Dolly IHP applications. Each plaintiff has submitted an affidavit setting forth evidence and observations that, when viewed in the light most favorable to Plaintiffs, would support a finding that Hurricane Dolly was a but-for cause of the damages to the applicant's home. *See* S.A.R. 7787–7812, 7904–7975. FEMA denied all of their applications and appeals. S.A.R. 7814.

After the President declared Hurricane Dolly a major disaster (designated "DR1780"), FEMA contracted to have 231 inspectors handle applications for disaster relief. A.R. 279. Following FEMA procedures, inspectors went to IHP applicants' primary residences and used tablet computers running FEMA-provided software to enter data to be sent to FEMA for eligibility determinations. *See, e.g.,* A.R. 427, 429, 597. The software on the tablet requires the inspector to answer three yes-or-no questions FEMA deems to correspond to the "safe," "sanitary," and "secure" standards of 44 C.F.R. § 206.110 (2008) to make a habitability, and therefore overall eligibility, determination about the entire home. *See* A.R. 383–84. Also,

the software separately presents the inspector with a series of "deferred maintenance" checkboxes corresponding to areas of real-property damage affecting living spaces. *See* A.R. 427, 429 (software data entry/review screens). FEMA directed inspectors to record damage to real property affecting living spaces in individual line items in the software but told them that "deferred maintenance" should not be listed except by checking the separate boxes. *See* A.R. 502, 504. Thus, an inspector following FEMA directives would not have reported the nature and extent of damage to line items categorized as "deferred maintenance."

The inspector also can input comments, both "canned" and custom. At a briefing of Hurricane Dolly inspectors, FEMA's notes state that it emphasized the "importance of comments to support the habitability call when the specs are borderline." A.R. 510. FEMA also told inspectors to "expect substandard construction [and] deferred maintenance...." A.R. 510.

Next, the inspectors uploaded their data to a FEMA-operated computer system called NEMIS. *See* A.R. 597. As FEMA puts it, "NEMIS makes a determination about eligibility, generates the appropriate payment for eligible items, and generates a letter explaining the award." A.R. 535. NEMIS employs FEMA-programmed business rules to make eligibility determinations. *See, e.g.,* A.R. 256. Nevertheless, NEMIS has a human services module, and FEMA expressly reserves the right to review inspections manually. *See* A.R. 431. All appeals are handled manually, and, when FEMA orders an appeal inspection, the two inspections are compared one line item at a time. *See* S.A.R 97:5–98:6 (stating same standards apply to appeal inspections).

FEMA denied 14,900 Hurricane Dolly IHP applications on the ground that the applicant suffered insufficient disaster-related damage. S.A.R. 2975 (as of Sept. 3, 2008). Of those denials, more than 50% were due to a finding of deferred maintenance. S.A.R. 217: 14–218:12. FEMA ordinarily sees a 6% IHP denial rate. S.A.R. 2962. Inspectors recorded deferred maintenance in 24,027 Hurricane Dolly inspections. S.A.R. 1044.[4]

## II. LEGAL STANDARD

### A. *Summary Judgment*

█ Summary judgment is appropriate when the movant establishes that the pleadings, affidavits, and other evidence available to the Court demonstrate that no genuine issue of material fact exists, and the movant is thus entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Piazza's Seafood World, LLC v. Odom,* 448 F.3d 744, 752 (5th Cir.2006); *Lockett v. Wal–Mart Stores, Inc.,* 337 F.Supp.2d 887, 891 (E.D.Tex.2004). Judicial review of agency action under the APA is ordinarily confined to "the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985) (citing *Citizens to Pres. Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)); *see also Goonsuwan v. Ashcroft,* 252 F.3d 383, 390 n. 15 (5th Cir.2001). A reviewing court "is not generally empowered to conduct a de novo inquiry into the matter being reviewed." *Florida Power & Light Co.,* 470 U.S. at 744, 105 S.Ct. 1598; *see also Overton Park,* 401 U.S. at 419, 91 S.Ct. 814. As a panel of the Fifth Circuit put it in *Girling Health Care, Inc. v. Shalala:*

4. The record does not show, and the parties do not discuss, to what extent, if at all, the group of 14,900 denials overlaps with the group for which deferred maintenance was recorded on at least one line item.

The summary judgment procedure is particularly appropriate in cases in which the court is asked to review or enforce a decision of a federal administrative agency. The explanation for this lies in the relationship between the summary judgment standard of no genuine issue as to any material fact and the nature of judicial review of administrative decisions.... [T]he administrative agency is the fact finder. Judicial review has the function of determining whether the administrative action is consistent with the law—that and no more.

85 F.3d 211, 214–15 (5th Cir.1996) (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.: Civil* 2d § 2733 (1983)).

"A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Piazza's Seafood World, LLC*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all evidence in the light most favorable to the nonmoving party. *Id.*, 448 F.3d at 752; *Lockett*, 337 F.Supp.2d at 891. Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc, per curiam). Thus, the Court will not, "in the absence of proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990)) (emphasis removed); *see also TIG Ins. Co. v. Eagle, Inc.*, No. 05–0179, 2007 WL 861153, at *2 (E.D.La. March 19, 2007) (quoting *Little*, 37 F.3d at 1075). The non-movant has no duty to respond to a motion for summary judgment until the moving party carries its initial burden of showing that no genuine issue of fact exists. *See Lockett*, 337 F.Supp.2d at 891 (citing *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir.1993)). However, if the movant carries its burden, the non-movant must then come forward with specific evidence to show that there is a genuine issue of fact. *Id.; see also Ashe*, 992 F.2d at 543. The non-movant may not merely rely on conclusory allegations or the pleadings. *Id.* Rather, it must cite specific facts identifying a genuine issue to be tried in order to avoid summary judgment. *See Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F.Supp.2d at 891. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir.1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n. 7 (5th Cir.1992)). Thus, once it is shown that a genuine issue of material fact does not exist, "[s]ummary judgment is appropriate ... if the non-movant 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.' " *Arbaugh v. Y & H Corp.*, 380 F.3d 219, 222–23 (5th Cir.2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

■ When parties file cross motions for summary judgment, each motion "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *Shaw Constrs. v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir.2004); *accord. CareFlite v. Office & Prof'l Emps. Int'l Union, AFL–CIO*, 612 F.3d 314, 318 (5th Cir.2010) (citing *Shaw Constrs.*, 395 F.3d at 539); *White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir.2005) ("review[ing cross motions] independently,

with evidence and inferences taken in the light most favorable to the nonmoving party" (citing *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir.2001))). Only "[i]f there is no genuine issue and one of the parties is entitled to prevail as a matter of law" can summary judgment be entered on cross motion. *Shaw Constrs.*, 395 F.3d at 539.

### B. *The Administrative Procedure Act*

Sometimes, as in this case, the merits of an APA case and a motion to supplement the administrative record can become intertwined. *See, e.g., Gulf Coast Rod Reel & Gun Club v. U.S. Army Corps. of Eng'rs*, No. 3:13–CV–126, 2015 WL 1883522, at *5–*6 (S.D.Tex. Apr. 20, 2015) (Costa, J.) (delaying consideration of some requests to supplement administrative record "until [the court] has the full merits briefing"). As a result, an overview of the applicable APA law helps frame the Court's analysis of the motion to supplement the administrative record.

 The APA declares that "a person may not in any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published." 5 U.S.C. § 552(a)(1); *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 630 (5th Cir.2001). The word "rule," for APA purposes, means "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency...." 5 U.S.C. § 551(4). Further, the APA provides for notice-and-comment rulemaking as follows:

(b) General notice of proposed rule making shall be published in the Federal Register, unless persons subject thereto are named and either personally served

or otherwise have actual notice thereof in accordance with law

. . . .

Except when notice or hearing is required by statute, this subsection does not apply—

(A) to interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice

. . . .

(c) After notice required by this section, the agency shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation. After consideration of the relevant matter presented, the agency shall incorporate in the rules adopted a concise general statement of their basis and purpose. . . .

5 U.S.C. § 553(b)-(c); *see also* § 551(a)(5) (defining rulemaking as an "agency process for formulating, amending, or repealing a rule"). The notice-and-comment process serves at least two purposes: "(1) to allow the agency to benefit from the expertise and input of the parties who file comments with regard to the proposed rule, and (2) to see to it that the agency maintains a flexible and open-minded attitude towards its own rules, which might be lost if the agency had already put its credibility on the line in the form of 'final' rules." *Nat'l Tour Brokers Ass'n v. United States*, 591 F.2d 896, 902 (D.C.Cir.1978) (noting individuals affected by final rule might be discouraged from submitting comments, thinking the matter *a fait accompli*). "Congress realized that an agency's judgment would be only as good as the information upon which it drew. It prescribed these procedures to ensure that the broadest base of information would be provided to the agency by those most interested and

perhaps best informed on the subject of the rulemaking at hand." *Phillips Petroleum Co. v. Johnson,* 22 F.3d 616, 620 (5th Cir.1994) (citing *Shell Oil Co. v. Fed. Energy Admin.,* 574 F.2d 512, 516 (Temp.Emer.Ct.App.1978)); *United States v. Dean,* 604 F.3d 1275, 1278 (11th Cir. 2010) ("The purpose of the notice provision is to disclose the thinking of the agency and the data relied on. Furthermore, notice and comment allows an agency to reconsider, and sometimes change, its proposal based on the comments of affected persons." (alterations, citations, and quotations omitted)). If the agency does not comply with the APA's notice-and-comment requirement before promulgating a covered rule, the rule is invalid. *See Prof'ls & Patients for Customized Care v. Shalala,* 56 F.3d 592, 595 (5th Cir.1995) ("If [the disputed agency document] were a substantive rule it would be unlawful, for it was promulgated without the requisite notice-and-comment."); *Mares v. Fed. Bureau of Prisons,* 401 F.Supp.2d 775, 777 (S.D.Tex.2005) ("Failure to comply with the notice and comment provision of the APA invalidates a rule covered by the APA." (citing *Nat'l Org. of Veterans' Advocates, Inc. v. Sec'y of Veterans Affairs,* 260 F.3d 1365, 1375 (Fed.Cir.2001))).

▆▆▆ Here, FEMA relies on the exceptions for procedural and interpretative rules.[5] § 553(b)(A). As the APA's text makes clear, interpretative rules do not need to be promulgated through the notice-and-comment process. 5 U.S.C. § 553(b)(A); *Perez v. Mortg. Bankers*

*Ass'n,* —— U.S. ——, 135 S.Ct. 1199, 1203–04, 191 L.Ed.2d 186 (2015). "The 'APA's notice and comment exemptions must be narrowly construed.'" *Prof'ls & Patients for Customized Care,* 56 F.3d at 595 (quoting *United States v. Picciotto,* 875 F.2d 345, 347 (D.C.Cir.1989)); *see also United States v. Johnson,* 632 F.3d 912, 928 (5th Cir.2011) ("[I]t is well established that the good cause exception to notice-and-comment should be read narrowly in order to avoid providing agencies with an escape clause from the requirements Congress prescribed." (citations and quotations omitted)). Acknowledging the body of case law and scholarly debate on the subject, the Supreme Court has said that "the critical feature of interpretative rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez,* 135 S.Ct. at 1204 (quoting *Shalala v. Guernsey Mem'l Hosp.,* 514 U.S. 87, 99, 115 S.Ct. 1232, 131 L.Ed.2d 106 (1995)). At this point, the Court highlights one aspect of the analysis required: "[t]he label that the particular agency puts upon its given exercise of administrative power is not ... conclusive; rather, it is what the agency does in fact" with that policy that informs the inquiry. *Prof'ls & Patients for Customized Care,* 56 F.3d at 596 (quoting *Brown Express, Inc. v. United States,* 607 F.2d 695, 700 (5th Cir.1979) (first alteration in original)); *accord. Phillips Petroleum Co.,* 22 F.3d at 620. Consequently, courts have looked to evidence

---

5. Some rules exempt from notice-and-comment rulemaking must still be available to the public. The APA requires agencies to make, inter alia, the following information available to the public:

(C) rules of procedure, descriptions of forms available or the places at which forms may be obtained, and instructions as to the scope and contents of all papers, reports, or examinations;

(D) substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency

5 U.S.C. § 552(a)(1)(C)-(D) (2012); *see also, e.g., Phillips Petroleum Co.,* 22 F.3d at 620 (considering whether rule was exempt from notice-and-comment rulemaking as a "procedural rule" or "general statement of policy").

of agency practice when deciding whether Congress required notice-and-comment rulemaking in the APA. *See, e.g., Shell Offshore Inc.,* 238 F.3d at 628 (consulting Department of "Interior's internal memoranda and correspondence with [plaintiff] [to determine] that Interior's denial of [plaintiff]'s request was the result of a departure from Interior's previous practice of treating as approved all filed FERC tariffs"); *Prof'ls & Patients for Customized Care,* 56 F.3d at 599–600 (considering, when deciding whether CPG 7132 was interpretative rule, "evidence that, since CPG 7132. 16's promulgation: (1) the FDA has used the nine factors listed in CPG 7132. 16 when inspecting pharmacies, and has relied on those factors to determine whether federal enforcement actions were warranted; (2) in numerous letters the FDA has warned pharmacists that they were engaged in drug manufacturing, rather than traditional compounding, because they were conducting some, or all, of the activities listed in CPG 7 132. 16, and (3) the FDA has furnished copies of CPG 7132. 16 to pharmacists who inquired about the legal restrictions on drug compounding").

III. MOTION TO SUPPLEMENT ADMINISTRATIVE RECORD

■ When it filed its pending motion to dismiss, FEMA designated a 709–page administrative record. Dkt. No. 118–2 to 118–11. Plaintiffs move to supplement that record with 11,188 pages of additional material. Mot. Suppl. Admin. R. 5, Dkt. No. 121. FEMA characterizes Plaintiffs' motion to supplement as "unwarranted and unnecessary," Dkt. No. 141 at 1. The Court concludes that Plaintiffs have carried their burden to show that supplementation is warranted only for limited background and to the extent their evidence sheds light on how FEMA, in fact, utilized the policies at issue here.

A. *Governing Law*

■ The APA requires a court reviewing agency action to "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706; *Medina Cty. Envtl. Action Ass'n v. Surface Transp. Bd.,* 602 F.3d 687, 706 (5th Cir.2010). Under the so-called "record rule," a court reviewing agency action under the APA ordinarily "[can]not review evidence outside of the administrative record." *Indep. Turtle Farmers of La. Inc. v. United States,* 703 F.Supp.2d 604, 610 (W.D.La. 2010) (citing *Louisiana ex rel. Guste v. Verity,* 853 F.2d 322, 327 n. 8 (5th Cir. 1988)). The reviewing court must base its decision, however, on the "whole record," that is "the 'full' administrative record that was before the agency at the time of the decision." *City of Dallas v. Hall,* Nos. 3:07–CV–0060–P, 3:07–CV–0213–P, 2007 WL 3257188, at *4 (N.D.Tex. Oct. 29, 2007) (citing *Overton Park,* 401 U.S. at 420, 91 S.Ct. 814 and *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 743–44, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985)). An agency cannot "unilaterally determine what constitutes the administrative record," and its "designation of the administrative record, like any established administrative procedure, is entitled to a presumption of administrative regularity" only. *Id.* (citing *Bar MK Ranches v. Yuetter,* 994 F.2d 735, 739–40 (10th Cir.1993)). Hence, the Fifth Circuit has held that, to prevail on a motion to supplement the record designated by the agency, "the moving party [must] demonstrate[ ] 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record compiled by the agency." *Medina Cty. Envtl. Action Ass'n,* 602 F.3d at 706 (quoting *Am. Wildlands v. Kempthorne,* 530 F.3d 991, 1002 (D.C.Cir.2008)). Plaintiffs cannot carry their burden simply by asserting that the facts established by the evidence they wish to add to the record

are undisputed, Mot. Suppl. Admin. R. 4, any more than they can by asserting in a conclusory fashion that the record is incomplete and that a particular exception applies. *See Hall,* 2007 WL 3257188, at *10 (denying motion to supplement where movant "contend[ed] in a conclusory fashion that an exception should be made for this document because it falls within several of the exceptions for allowing extra-record evidence").

■ Courts sometimes conflate supplementation of the administrative record and extra-record evidence. *Gulf Coast Rod Reel & Gun Club,* 2015 WL 1883522, at *1 & n. 1. Supplementation completes the record by adding something that "should have properly been included in the administrative record [but] was not … [due to] a clerical error" or for any other reason. *Id.* (quoting in part *Cape Hatteras Access Pres. All. v. U.S. Dep't of Interior,* 667 F.Supp.2d 111, 113–14 (D.D.C.2009)). A complete administrative record "should include all materials that 'might have influenced the agency's decision,' and not merely those upon which the agency relied in its final decision." *Hall,* 2007 WL 3257188, at *4 (quoting *Amfac Resorts, L.L.C. v. U.S. Dep't of Interior,* 143 F.Supp.2d 7, 12 (D.D.C.2001)). Supplementation, therefore, accords with the record rule and does not pose the same difficulties as consideration of "evidence not considered by the agency … [, which] presents a more challenging legal question." *Gulf Coast Rod Reel & Gun Club,* 2015 WL 1883522, at *1.

■ Supplementation can be appropriate when "there was such failure to explain administrative action as to frustrate effective judicial review," *Camp v. Pitts,* 411 U.S. 138, 142–43, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973), or, if administrative findings were made at the time of the challenged action, upon a "strong showing of bad faith or improper behavior" on the part of the

agency. *Overton Park,* 401 U.S. at 420, 91 S.Ct. 814. Thus, this Court has previously articulated the following list of situations in which courts have utilized supplementation or considered extra-record evidence:

(1) when agency action is not adequately explained in the record before the court; (2) when looking to determine whether the agency considered all relevant factors; (3) when a record is incomplete; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues; (5) when evidence arising after the agency action shows whether the decision was correct or not; (6) in certain NEPA cases; (7) in preliminary injunction cases; and (8) when an agency acts in bad faith.

*Hall,* 2007 WL 3257188, at *5 (citing *Davis Mountains Trans–Pecos Heritage Ass'n v. U.S. Air Force,* 249 F.Supp.2d 763, 776 (N.D.Tex.2003)); *see also Esch v. Yeutter,* 876 F.2d 976, 991 (D.C.Cir.1989); Dkt. No. 75 at 14. The Fifth Circuit recently articulated a list of three circumstances warranting supplementation:

(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, …

(2) the district court needed to supplement the record with "background information" in order to determine whether the agency considered all of the relevant factors, or

(3) the agency failed to explain administrative action so as to frustrate judicial review.

*Medina Cty. Envtl. Action Ass'n,* 602 F.3d at 706 (citing *Am. Wildlands,* 530 F.3d at 1002). No party expressly argues here that these lists differ materially, and the Court therefore merely observes that "[m]ost, and perhaps all, of the eight *Davis Mountains* exceptions fit within the three broader categories in *Medina." Gulf Coast Rod Reel & Gun Club,* 2015 WL

1883522, at *3; *see also id.* at *4 (concluding that the difference between the two lists "does not have much practical significance for the materials" sought to be added in that case).

## B. *Effect of Discovery Rulings*

This Court's discovery orders do not, as Plaintiffs contend, require the Court to grant their motion to supplement the administrative record either in part or in its entirety. While this Court enumerated circumstances in which supplementation may be appropriate in its order entered March 30, 2011, the Court concluded in the next sentence only that

FEMA's admission to the Fifth Circuit [that FEMA prepared disaster-specific items used to decide Hurricane Dolly home repair applications] supports the application of the incompleteness exception *to permit discovery* . . . at least to determine the nature of the disaster-specific guidance prepared to aid in the decision of applications for disaster-related assistance and to what degree, if at all, that guidance was used to deny applications for housing repair assistance.

Dkt. No. 75 at 15 (emphasis added, footnote omitted). In its order denying FEMA's motion to reconsider that ruling, this Court's allusion to the incompleteness exception supplied a reason only to require the parties to conduct additional discovery; the Court did not predetermine that what was discovered would be added to the administrative record. *See* Dkt. No. 86 at 4–5; *see also* Dkt. No. 96 at 1–2 (granting motion for clarification and extending discovery deadlines).

▉▉▉ Like a party moving to supplement the record, a party wishing to conduct discovery after the agency has designated an administrative record "must overcome the standard presumption that the agency properly designated the Administrative Record." *Hall,* 2007 WL 3257188, at *6 (quoting *Amfac,* 143 F.Supp.2d at 12) (quotations omitted). Unlike a party moving to supplement the administrative record, however, a party seeking extra-record discovery needs to make a probabilistic showing that discovery is sufficiently likely to unearth evidence relevant to deciding whether the record should be supplemented or added to. *See id.* (elaborating that party seeking discovery must make "a significant showing—variously described as 'strong', 'substantial', or 'prima facie'—that it will find material in the agency's possession indicative of bad faith or an incomplete record" (quoting *Amfac,* 143 F.Supp.2d at 12)). Though the issues can be related, that something has been produced in discovery authorized for a particular purpose does not necessarily mean that it is admissible for that purpose. *See Harris v. J.B. Hunt Transport, Inc.,* 423 F.Supp.2d 595, 600 (E.D.Tex.2005) (discussing, in ERISA case, the "close correlation between admissible evidence and the range of evidence reasonably calculated to lead to admissible evidence" through discovery and thereby acknowledging that a discovery ruling does not determine that evidence that may be discoverable is admissible). Indeed, deciding whether the record is incomplete or extra material should be added to it may itself entail consideration of extra-record evidence, but using extra-record evidence for that purpose does not automatically require supplementation. *See Davis Mountains,* 249 F.Supp.2d at 776 ("an adequate record can sometimes only be determined 'by looking outside the [AR] to see what the agency may have ignored" (quoting *Cty. of Suffolk v. Sec'y of Interior,* 562 F.2d 1368, 1384 (2d Cir.1977)) (alteration in original)); *Gulf Coast Rod Reel & Gun Club,* 2015 WL 1883522, at *6–*7 (declining to rule on portions of motion to supplement until the court had opportunity to consider whether supplementation was warranted at summary judgment). There-

fore, though they may bear to some degree on the question presented by a subsequent motion to supplement, this Court's rulings permitting extra-record discovery did not, ipso facto, require this Court to find that the record is incomplete based on the discovery produced or that any material produced during discovery must be added to the administrative record designated by FEMA.

### C. *Redundant Material*

 As FEMA points out, Plaintiffs' proposed supplemental administrative record contains some material that is already in the administrative record. *Compare, e.g.,* S.A.R. 2979–2981 (IHP Habitability Document dated 4/04/07) *with* A.R. 325–27 (same); S.A.R. 3785–3802 (document entitled IHP Inspection Guidelines DR1720T) with A.R. 511–28 (same). The dueling records also contain two versions of one document, which FEMA describes as "substantively the same," Dkt. No. 141 at 2; both versions predate DR1780.[6] *Compare* Pls.' proposed S.A.R. 00544–53 (Habitability Issues section of Disaster Housing Inspectors Training/Refresher Course dated Apr. 12, 2007) *with* A.R. 499–508 (version of document dated Apr. 15, 2006). Except perhaps to introduce more legible copies, the record rule does not permit supplementation with redundant material. *Couvillion v. Reddy Ice Corp.,* No. 12–204–SDD–RLB, 2013 WL 3725153, at *6 (M.D.La. July 12, 2013) (denying motion to add letter to record because review of record showed that "[t]he ... letter is already part of the administrative record" in ERISA case).

### D. *Material Needed to Conduct Judicial Review of How Challenged Agency Policies Used In Fact*

Finally, Plaintiffs' proposed supplemental administrative record includes material that FEMA facially did not consider during DR–1780 and having, at most, tangential relevance to the specific questions this Court must answer under the APA.[7] *See, e.g.,* S.A.R. 7184–7224 (report on FEMA's alleged involvement in Hurricane Francis disaster relief in 2004); S.A.R. 7619–22 (property and casualty insurers' report about damage caused by Hurricane Ike); S.A.R. 7732–33 (National Weather Service, Brownsville, Texas Weather Forecast Office web page on hurricane preparedness last modified May 7, 2010). Without discussing the specifics of its contents, Plaintiffs declare baldly and without citation in their motion to supplement that the proposed S.A.R. "is fifteen times the size of FEMA's administrative record, but it is also fifteen times more informative." Mot. Suppl. Admin. R. 4. That conclusory statement does not carry Plaintiffs' burden to show that an exception to the record rule should apply. *See Hall,* 2007 WL 3257188, at *10 (rejecting conclusory statement as insufficient to warrant supplementation). Nonetheless, Plaintiffs suggest that the proposed supplemental record will provide helpful background material for judicial review. *See Medina Cty. Envtl. Action*

---

6. Plaintiffs do not challenge FEMA's characterization of the two versions of this document as substantively identical, and, as far as the Court can determine, Plaintiffs do not cite the version in their proposed supplemental administrative record anywhere in their statement of facts or motion for summary judgment. For these reasons, the Court will exclude this document as redundant.

7. The proposed supplemental administrative record also includes excerpts of the Stafford Act and its implementing regulations. S.A.R. 8332–8461. While plaintiffs concede FEMA considered those materials, they can be found in the U.S.Code and Code of Federal Regulations respectively without being added to the administrative record. The Court need not take judicial notice.

*Ass'n,* 602 F.3d at 706; *cf. Ridgely v. FEMA,* 512 F.3d 727, 740 (5th Cir.2008).

After reviewing the portions of the proposed S.A.R. cited by the parties, the Court will rely on portions of it to make the de facto determinations required here. As previously explained, the scope of review entails consideration of not only the text of the policies Plaintiffs claim are legislative rules but also "what the agency does in fact" with those policies. *Prof'ls & Patients for Customized Care,* 56 F.3d at 596 (quoting *Brown Express, Inc.,* 607 F.2d at 700); *see also Shell Offshore Inc.,* 238 at 628; *Phillips Petroleum Co.,* 22 F.3d at 619 ("[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." (quoting *Brown Express, Inc.,* 607 F.2d at 700) (alteration in original)). Consistent with the required scope of review, this Court permitted discovery reasonably calculated to produce evidence of what FEMA in fact did with the challenged policies. *See* Dkt. No. 75 at 15 & n. 4 (allowing discovery directed to the question "to what degree, if at all, [disaster-specific] guidance was used to deny applications for housing repair assistance"); Dkt. No. 96 at 1–2 (explaining why scope of discovery, on the one hand, and ruling that Plaintiffs' complaint does not challenge the individual denials of their claims on the other, accord with one another). FEMA certifies that its administrative record includes all documents it "considered or otherwise employed" but does not address its de facto usage of those

policies. Decl. of John. M. Carleton, Dkt. No. 118–2 ¶ 6. Hence, the Court will, for example, consider the Federal Rule of Civil Procedure 30(b)(6) deposition of FEMA's representative, S.A.R. 1–299, to the extent it provides background and sheds light on how FEMA, in fact, treated and implemented the challenged policies, but, except for the portions of the S.A.R. cited herein, the Court finds that Plaintiffs have not overcome the presumption accorded FEMA's designation of the administrative record.[8]

## IV. SCOPE OF REVIEW

 Before conducting an APA analysis, the Court must first determine which of the policies Plaintiffs cite in their motion for summary judgment should be analyzed. Summary judgment cannot be entered on a claim not pleaded in the complaint, as that claim is not fairly before the Court. *See, e.g., Quintanilla v. Tex. Television, Inc.,* 139 F.3d 494, 498–99 (5th Cir.1998) (holding that plaintiffs who pleaded copyright-infringement claim did not plead claim for accounting of copyright co-owners and affirming summary judgment and denial of leave to amend to add accounting claim where "summary judgment motion was prepared based on the pleadings on file"); *Faulk v. Duplantis,* Nos. 12–1714, 12–1717, 2013 WL 4431339, at *4–*5 (E.D.La. Aug. 16, 2013) (declining, in employment case, to consider retaliatory acts raised for the first time in affidavit in support of summary-judgment motion because "Rule 8(a) is [not] so re-

---

**8.** The Court also does not rely on Plaintiffs' Statement of Undisputed Facts filed with their motion for summary judgment, Dkt. No. 119–2, to the extent it, in turn, cites the excluded S.A.R. documents. FEMA ties its opposition to Plaintiffs' request to exceed the undersigned's 25–page limit for motions to its reasons for opposing supplementing the administrative record. Def.'s Partial Opp'n

Mot. Exceed Page Limit 2, Dkt. No. 142. Putting aside the question whether the 25–page limit applies to a separately filed statement of undisputed facts, the Court will permit its filing on the understanding that the substantive purpose of FEMA's opposition has nonetheless been vindicated, at least to the extent the Court has denied Plaintiffs' motion to supplement.

laxed that [a plaintiff] need not plead the specific acts of retaliation upon which he bases his claim for relief. Defendants cannot defend a retaliation case that behaves as a moving target."); *Janik v. City of Dallas*, No. 3:95–CV–2594, 1998 WL 249213, at * 1 (N.D.Tex. May 12, 1998) ("This court will not grant summary judgment dismissing a claim that plaintiffs have not pleaded."). In their motion for summary judgment, Plaintiffs identify several statements in FEMA documents they contend adversely affected them under § 552(a)(1) and should have been published under § 553:

(1) A deferred-maintenance policy providing that "deferred real property damage listed in line items ... be significant, obvious and without question ... [but] never be speculative;" A.R. 505; *accord.* A.R. 524; S.A.R. 6779;

(2) A primary-cause rule allegedly determining which homes are deemed habitable under 42 U.S.C. § 5174(b)(1) and thus eligible for assistance; A.R. 326–27, 501, 515; S.A.R. 6247;

(3) An internal FEMA memorandum setting a $50 minimum for IHP damages applied since July 10, 2005; *see* S.A.R. 475; S.A.R. 18:3–8 (explaining that computerized system used to track applications programmed to deem applicant unqualified if damages total less than $50); and

(4) Other provisions of three documents given to inspectors in the wake of hurricane Dolly, *see* A.R. 382–90, 511–28; S.A.R. 6219–47, such as "[d]o not record 'Roof Covering, Replace' simply because the dwelling has suffered interior damage from wind driven rain. It is not uncommon for new leaks to occur through older (deferred maintenance) roofs,

to be blown up under shingles, through vents, etc." A.R. 518.

FEMA contends that Plaintiffs' complaint gives it fair notice of a challenge to only the first of these putative rules. Def.'s Resp. Pl.'s Mot. Summ. J. 18. Plaintiffs respond that the complaint includes general language giving FEMA fair notice of their claim that FEMA utilized or considered all of the unpublished rules they identify. Like the parties, the Court assumes, without deciding, all of the purported rules identified by Plaintiffs in their motion for summary judgment except the first rule listed above, A.R. 504–05, do not fall within the ambit of the term "deferred maintenance policy." *But see* A.R. 345 (mentioning term "deferred maintenance" in language regarding habitability determination); A.R. 518 (mentioning "deferred maintenance").

### A. Fair Notice

■ The Federal Rules of Civil Procedure require a complaint stating a claim for relief to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Elaborating on the fair-notice standard when considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Supreme Court explained in *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (decided after the plaintiffs in this civil action filed their complaint), "[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." 556 U.S. at 679, 129 S.Ct. 1937 (citation omitted). That is, determining whether a complaint gives fair notice of a claim requires a context-specific analysis of the complaint's allegations read together in their entirety. *See id.; Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1402

(5th Cir.1996), *rev'd en banc on other grounds* 113 F.3d 1412 (5th Cir.1997) (stating defendants "self-servingly quoted only parts of the complaint. In short, the quoted paragraphs do not fairly represent the complaint as a whole. We conclude that when Doe's complaint is read in its entirety it is seen to plead [plaintiff]'s claims with more than enough particularity"); *Rachal v. Ingram Corp.*, 795 F.2d 1210, 1214 n. 3 (5th Cir.1986) (holding complaint, portions of which "ambiguously stated an action under the Jones Act and general maritime law" gave notice that plaintiff brought civil action at law "[w]hen [allegations were] read together with the jury demand"); *Brown v. United Parcel Serv.*, 237 F.3d 631, 2000 WL 1701739, at *4 (5th Cir.2000) (unpublished table decision) ("[R]ead in its entirety, Brown's complaint indicates she believes she is due more benefits under the Plan than she is currently receiving, in essence, a claim for benefits or at least to clarify her right to benefits."); *Aviall Servs., Inc. v. Cooper Indus., LLC*, 572 F.Supp.2d 676, 688 (N.D.Tex.2008) ("Although Aviall disavows any attempt to recover such costs, various allegations of its third complaint can be read together to assert such a claim regarding the Lemmon Terminal." (citing and quoting specific paragraphs of complaint)); *Williams v. Allstate Fire and Cas. Ins. Co.*, No. H11–530, 2012 WL 1098424, at *8 (S.D.Texas Mar. 30, 2012) ("read[ing] two paragraphs of complaint] together with the complaint's remaining allegations" to decide whether complaint met heightened pleading standards of Federal Rule of Civil Procedure 9(b)); *United States ex rel. Jamison v. McKesson Corp.*, No. 3:08CV214–SA–DAS, 2010 WL 1223876, at *1 (N.D.Miss. Mar. 25, 2010) (concluding, "[b]ased on the Court's analysis of the DME supplier allegations and Beverly's involvement ... [that] Plaintiffs' Complaint, read in its entirety, alleges a claim under [the applicable statute]");

*Williams v. Grimmett*, No. 2:96CV 11–B–A, 1996 WL 671534, at * 1 (N.D.Miss. Aug. 27, 1996) (citation omitted) ("Upon review of the first amended complaint in its entirety, the court finds that the factual allegations of the specific circumstances, the description of the decedent's four gunshot wounds in the autopsy report and the allegations based on the autopsy report meet the heightened pleading requirement....").

### B. *The Fifth Circuit's Opinion*

The Fifth Circuit's decision in *LUPE*, 608 F.3d 217, of the preliminary injunction does not, as FEMA suggests, dispose conclusively of this issue. As FEMA correctly notes, the background section describes Plaintiffs' claims as follows:

> The Complaint alleges that FEMA violated 42 U.S.C. §§ 5151(a) and 5174(j) "by failing to adopt and implement ascertainable standards necessary to insure that housing repair assistance under 42 U.S.C. § 5174(c)(2) is made available to victims of Hurricane Dolly in an equitable and impartial manner." It also alleges that FEMA's use of an unpublished "deferred maintenance policy" violates 42 U.S.C. § 5151(a) by promoting economic discrimination.

*LUPE*, 608 F.3d at 218; *see also id.* at 225 ("Our review of the record does not indicate that it has been definitively established that FEMA denies assistance wholly on the basis of an unpublished 'deferred maintenance' rule."). A footnote, however, omits "deferred maintenance" when discussing consideration of unpublished rules on remand. *Id.* at 223 n. 2 ("If on remand Plaintiffs are able to establish that FEMA makes eligibility determinations using nonpublished criteria, then *Morton* would become more relevant."). Ultimately, the Fifth Circuit expressly declined to reach Plaintiffs' claims that FEMA employed un-

published rules, however, so it did not need to determine the precise scope of Plaintiffs' claims. *See id.* at 225, 94 S.Ct. 1055; *see also Med. Ctr. Pharm. v. Holder,* 634 F.3d 830, 834 (5th Cir.2011) ("[A]n issue that is not expressly or implicitly decided on appeal does not become part of the law of the case." (citing *Alpha/Omega Ins. Servs., Inc. v. Prudential Ins. Co. of Am.,* 272 F.3d 276, 279 (5th Cir.2001))).

### C. *Analysis of Plaintiffs' Complaint*

After considering the complaint in its entirety, the Court determines that, viewed as a whole in context, it gives fair notice of Plaintiffs' claim that FEMA used unpublished rules other than "deferred maintenance" to decide their applications for IHP benefits. The following three paragraphs illustrate the distinction Plaintiffs draw between unpublished rules used to decide their applications for disaster relief as a general category and the more specific deferred-maintenance label allegedly used by FEMA to explain the denial of some claims:

23. FEMA collects, maintains, and uses information concerning a category of home repair applications that FEMA labels "deferred maintenance," but publicly available legal standards do not mention "deferred maintenance" or explain how FEMA ascertains this information or uses it in its housing repair assistance decisions.

24. FEMA has applied unascertainable legal standards to deny housing repair assistance to somewhere between ten and fifteen thousand low-income families in the Rio Grande Valley since Hurricane Dolly struck, roughly half of all applicants.

25. In response to a written request from Plaintiffs' counsel, FEMA has not provided or agreed to discuss its legal standards for deciding home repair applications.

Compl. ¶¶ 23–25. If paragraphs 24–25 do not sweep more broadly than paragraph 23 as their more general language implies, then it is difficult to treat the latter two paragraphs as more than surplus language—a construction that should be avoided, if possible. *See, e.g., Cunningham v. Offshore Specialty Fabrications, Inc.,* 543 F.Supp.2d 614, 628 (E.D.Tex. 2008) ("The Court must consider the Complaint as a whole and not limit itself to isolated portions of the Complaint, and the Court must endeavor to give meaning to every word of the Complaint." (quoting *Trollinger v. Tyson Foods, Inc.,* No. 4:02–CV–23, 2007 WL 1574275, at *6 (E.D.Tenn. May 29, 2007))).

Further, according to the complaint, the "deferred maintenance" label used to describe the allegedly unpublished rules Plaintiffs challenge originated from FEMA employees, and, therefore, Plaintiffs' use of that label does not limit their § 552(a) and 553 claims when viewed in context. The complaint recounts two alleged incidents in which a FEMA employee told an individual plaintiff or her attorney that his or her application for housing assistance was denied due to "deferred maintenance." Compl. ¶¶ 59, 83. Elsewhere in their complaint, Plaintiffs repeatedly assert that they could not ascertain the nature of the rules used to decide their applications. *E.g.,* Compl. ¶ 26, 171. Moreover, Plaintiffs facially seek relief consistent with a challenge to all unpublished rules used to decide their applications. On the complaint's first page, Plaintiffs declare, without a qualification about deferred maintenance, that they sue to compel FEMA to "(a) publicly disclose the standards that it uses to decide applications for housing repair assistance; and (b) decide these applications ... without using hidden internal rules...." Compl. 1. Plaintiffs also plead on the last page of the complaint containing numbered allegations that "FEMA vio-

lates 42 U.S.C. § 5151(a) by implementing an unpublished and unascertainable 'deferred maintenance' policy that effectively disqualifies low-income families from housing repair assistance, promoting rather than preventing economic discrimination." *Id.* at 29 ¶ 171. On that same page, however, Plaintiffs request broader relief, viz, "all equitable relief necessary to ensure that FEMA housing repair assistance determinations in Disaster No. 1780 are made in compliance with 42 U.S.C. §§ 5151(a) and 5174(j). . . ." *Id.* at 29 ¶ 175. In context, Plaintiffs' references to deferred maintenance appropriated an ad-hoc label supplied by FEMA to describe the reason that some individual Plaintiffs' applications were denied, *see id.* ¶¶ 59, 83. As such, Plaintiffs' use of that label did not vitiate their more general allegations that FEMA used undisclosed rules to deny their applications, whatever the allegedly then-unascertainable and -unpleadable nature of those rules. *Cf. Mendoza v. Perez,* 754 F.3d 1002, 1015 (D.C.Cir.2014) (conducting Article III standing analysis and holding, where plaintiffs challenged the effect of 2011 rules and did not concede that previously promulgated rules were valid, that an agency's "previous failure to comply with the notice and comment requirements of the APA cannot excuse its later violation of those requirements, nor render the latter violation unreviewable").

Nonetheless, in light of the Fifth Circuit's opinion in *LUPE, see* 608 F.3d at 218, 225, and the foregoing analysis of the complaint, the Court finds that FEMA's position on the scope of the complaint was taken in good faith. A response to a motion for summary judgment raising a new claim may be treated as a motion to amend the complaint and, if the applicable standard is met, *see, e.g.,* Fed.R.Civ.P. 15(a)(2), 16(b)(4), maybe granted. *E.g., Sherman v. Hallbauer,* 455 F.2d 1236, 1242 (5th Cir. 1972) ("[I]n the interests of justice the district court should have construed the Shermans's frantically revised theory of the case, as plainly set forth in their memorandum in opposition to summary judgment, as a motion to amend the pleadings filed out of time" and granted it.). When that happens, the party moving for summary judgment has the procedural benefit of an opportunity to oppose the new claim in whatever way it sees fit. Entering summary judgment without affording the party that originally moved for summary judgment an opportunity to oppose the new claim would be unfair. *See* Fed. R.Civ.P. 56(f) (requiring "notice and a reasonable time to respond" before "grant[ing] the motion on grounds not raised by a party"). While Plaintiffs' response has not been construed as a motion to amend their complaint, the Court finds that FEMA deserves the benefit of the same procedural protection in light of its good-faith position on Plaintiffs' complaint in this opinion.

## V. APA ANALYSIS

Plaintiffs contend that the deferred-maintenance policy is a legislative rule, which must be published in the Federal Register pursuant to 5 U.S.C. § 552(a)(1) and be subjected to notice-and-comment rulemaking pursuant to § 553. FEMA counters with a three-fold response. First, FEMA relies on *Tearney v. Nat'l Transp. Safety Bd.,* 868 F.2d 1451, 1454 (5th Cir.1989) to argue that the deferred-maintenance policy is an "expression of a specific application of a policy" announced in the regulations upheld by the Fifth Circuit. Def.'s Mem. Supp. Mot. Summ. J. 18. For the same reason, FEMA also argues that Plaintiffs were not adversely affected by the deferred-maintenance policy as that phrase is used in § 552(a)(1). Dkt. No. 143 at 5; *see also* 5 .U.S.C. 552(a)(1) ("Except to the extent that a person has actual and timely notice of the terms thereof, a person may not in

any manner be required to resort to, or be adversely affected by, a matter required to be published in the Federal Register and not so published."). Finally, FEMA argues alternatively that the deferred-maintenance policy is exempt from notice-and-comment rulemaking as a procedural or interpretative rule. *See* 5 U.S.C. § 553(b)(A). Because they are so closely related, the Court addresses the first two arguments together.

### A. Adversely Affected by Any Matter Required to Be Published

Under the APA, "substantive rules of general applicability adopted as authorized by law, and statements of general policy or interpretations of general applicability formulated and adopted by the agency" have to be published in the Federal Register. 5 U.S.C. § 552(a)(1)(D). In *Tearney*, the Fifth Circuit held that a rule announced in an agency adjudication was "an expression of a specific application of the policy" articulated in a federal regulation rather than a statement of general applicability, and so the plaintiff could be, adversely affected by it even though it was not published in the Federal Register without running afoul of § 552(a)(1). 868 F.2d at 1454. FEMA contends that Plaintiffs were not "adversely affected" under 5 U.S.C. § 552(a)(1) by the deferred-maintenance policy for essentially the same reason. *See, e.g.,* Dkt. No. 143 at 8 ("It is of course undisputed that applicants were adversely affected where FEMA ultimately decided damage was ineligible because it was caused by deferred maintenance rather than the disaster. However, that adverse affect resulted from application of the statutory restriction of eligibility to disaster-related damages, not from the guidance on application of that restriction.").

Consequently, the cross motions for summary judgment require the Court to decide whether the deferred-maintenance policy fits one of the § 552(a)(1)(D) catego-

ries or expresses a specific application of a policy as in *Tearney*. The regulation in *Tearney* provided that "[n]o person may operate an aircraft in a careless or reckless manner so as to endanger the life or property of another," and the National Transportation Safety Board ("NTSB"), relying on an earlier agency adjudication, "ruled that taxiing while passengers were standing constituted a per se violation" of that regulation and suspended the plaintiff pilot. 868 F.2d at 1452 (quoting 14 C.F.R. 91.9 for text of regulation). The *Tearney* court found on a related issue that the "taxiing rule may not be said to be 'such a new departure' from [the NTSB's] other regulations as to be considered unforeseeable." *Id.* at 1453.

On the other hand, cases in which an agency announced a policy in a handbook or otherwise outside of the agency adjudication process generally reach the opposite result, even where the policy was applied in an adjudication. *See* 5 U.S.C. § 551(7) ("'adjudication' means agency process for the formulation of an order"). For example, in *Morton v. Ruiz*, the Bureau of Indian Affairs ("BIA") denied the plaintiff's application for general assistance benefits, citing the provisions of a BIA manual that had not been published in the Federal Register. 415 U.S. 199, 204, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974); *see also LUPE*, 608 F.3d at 223 n. 2 (noting that *Morton* might become more relevant to the analysis of this issue on remand). The manual limited "eligibility [for assistance] to Indians living 'on reservations' and in jurisdictions under the BIA in Alaska and Oklahoma." *Id.* at 204 & n. 6, 94 S.Ct. 1055 (quoting manual). The Supreme Court held, among other things, that "[t]he requirement that, in order to receive general assistance, an Indian must reside directly 'on' a reservation is clearly an important substantive policy" which fell within the category of "directives that 'in-

form the public of privileges and benefits available' and of 'eligibility requirements'" that had to be published. *Id.* at 235, 94 S.Ct. 1055. Similarly, in a pair of cases, *Davidson v. Glickman,* 169 F.3d 996 (5th Cir.1999) and *Phillips Petroleum Co. v. Johnson,* 22 F.3d 616 (5th Cir.1994), the Fifth Circuit held that the APA required publication of an internal agency paper and handbook respectively that "directly contradicted the text of the regulation at issue." *Shell Offshore Inc.,* 238 F.3d at 628 (discussing both cases). With this authority in mind, the Court examines the text of the policy and the record evidence of FEMA's use of it to decide Hurricane Dolly applications for disaster relief.

### 1. Narrowing Potentially Eligible Applicants

The deferred-maintenance policy Plaintiffs challenge appears in "Section 4—References D. Habitability Issues" of a document entitled Disaster Housing Inspectors Training/Refresher Course dated April 15, 2006.[9] A.R. 499. According to FEMA's undisputed declaration, the contractor that conducted Hurricane Dolly inspections "routinely conducts Disaster Housing Inspectors Training/Refresher Course[s]" using that document. Carleton Decl. ¶ 24. April 20, 2011, A.R. 279. In its entirety, the portion quoted by Plaintiffs reads:

> For the purpose of disaster housing inspections the term Deferred Maintenance will be applied to any real property item that has been neglected to the extent that it can no longer adequately perform its intended function. Examples of deferred maintenance are rotting boards, roofs with missing and/or crumbling shingles, and foundations with pre-disaster cracks all of which allow unwanted elements into the home.
>
> Items suffering from deferred maintenance that were not significantly worsened by the disaster are not to be listed in real property line items. The inspector will record areas of deferred maintenance not worsened by the disaster in the Post Inspection Screen. For instance, if the foundation has superficial cracks that are pre-existing and were not worsened by the disaster the inspector will check the Foundation/Masonry box under Deferred Maintenance.
>
> Any deferred real property damage listed in line items must have been significantly worsened by the disaster event. Disaster damages to these items must be significant, obvious and without question. The listing of deferred maintenance items worsened by storm should never be speculative.

A.R. 504–05; *see also* A.R. 505–07 (listing examples applying deferred-maintenance policy to hypothetical scenarios); A.R. 347 (stating in inspectors' handbook "[b]ecause it is not disaster-related, deferred maintenance damage is not paid for unless the inspector determines that the pre-existing

---

**9.** Noting that its raison d'etre is emergencies, FEMA argues that it should not be forced to publish its policies because it must respond flexibly to rapidly changing circumstances presented by a myriad of disasters. *See LUPE,* 608 F.3d at 224 ("Given the nature of FEMA's work and the compressed time it has to make individual determinations, the agency requires relatively wide discretion for the ground-level workers who make initial assistance decisions."). As the text states, the training materials containing the deferred-maintenance rule date some two years prior to Hurricane Dolly, yet FEMA made them a part of this administrative record. *See* A.R. 499. Given this lapse of time and the reasonable inference that FEMA utilized the same manual for all disasters between its promulgation date and Hurricane Dolly, FEMA's need for flexibility in the thick of disaster operations does not carry the day. The Court expresses no view at this juncture on how, if at all, the analysis of the disaster-specific guidance promulgated in the wake of Hurricane Dolly might differ.

damage was clearly made worse by the disaster"). FEMA maintains that this language has "no adverse effect vis-a-vis Plaintiffs or the public because [it and the other guidance in the administrative record] do not narrow or restrict eligibility for repair assistance beyond the plain meaning of limitations already set by [the Stafford Act]." Dkt. No. 143 at 5. Judicial constructions of the terms involved undermines FEMA's position, however.

"[D]isaster-related," the term FEMA chose in 44 C.F.R. § 206.117(c) (2008), ordinarily has a broad meaning. *Dan's City Used Cars, Inc. v. Pelkey,* —— U.S. ——, 133 S.Ct. 1769, 1778, 185 L.Ed.2d 909 (2013) (explaining that the "'ordinary meaning of ... words [related to] is a broad one', thus ADA's use of those words 'expresses a broad pre-emptive purpose'") (quoting *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 383, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992) (alteration in original)). "At the same time, the breadth of the words 'related to' does not mean the sky is the limit." *Id.* The Supreme Court describes the outer limits of the connection related-to denotes as "only a 'tenuous, remote, or peripheral'" *Id.* (quoting *Rowe v. N.H. Motor Transp. Ass'n,* 552 U.S. 364, 371, 128 S.Ct. 989, 169 L.Ed.2d 933 (2008)). On the other hand, the term disaster-related encompasses damages "'having a connection with or reference to' [the disaster] whether directly or indirectly." *Id.* (quoting *Rowe,* 552 U.S. at 370, 128 S.Ct. 989).

In contrast, the words employed by FEMA in the deferred-maintenance policy, A.R. 504–05, have been used by courts to winnow the required causational connection between damages and their but-for causes and to quantify distinct and narrower degrees of harm for which damages may be recovered. The phrase "without question" has been used to describe the dispositive weight and quantity of evidence needed to treat a theory of causation as established in law. *See Cole v. Gen. Motors Corp.,* 852 F.2d 568, 1988 WL 76522, at *3 (6th Cir.1988) (per curiam, table decision) ("The proof has shown here without question that this accident was caused solely by driver error." (quoting district court, capitalization of first letter in district court's decision)); *Adams v. UNUM Life Ins. Co. of Am.,* No. H–04–2179, 2005 WL 2030840, at *38 (S.D.Tex. Aug. 22, 2005) (equating phrase with one-sided view of subjective evidence: "[w]ithout an objective component to the disability proof requirement, administrative review of a participant's claim for benefits would be meaningless because a plan administrator would have to accept all subjective claims of the participant without question" (quoting *Williams v. UNUM Life Ins. Co. of Am.,* 250 F.Supp.2d 641, 648–49 (E.D.Va. 2003))). More than one court has employed the phrase "significantly worsened" to denote an aggravated degree of harm suffered distinguished expressly from the cause of that harm. *See W.C. v. Sec'y of Health & Human Servs.,* 100 Fed.Cl. 440, 449 (2011) (quoting *Loving v. Sec'y of Health & Human Servs.,* 86 Fed.Cl. 135, 144 (2009) to discuss statutory standard that vaccine "significantly aggravated" condition and requiring separate showing of "a medical theory causally connecting such a significantly worsened condition to the vaccination"). As for damage being obvious, harms obviously caused by a disaster have been contrasted with less obvious harms, some of which may nonetheless be economically more devastating. *See Askew v. Am. Waterways Operators, Inc.,* 411 U.S. 325, 333 n. 5, 93 S.Ct. 1590, 36 L.Ed.2d 280 (1973) ("As to the damages of oil spills to ecological factors it was recently said in 10 Harv. Int'l L.J. 316, 321–323 (1969)" discussing compensable damages caused by oil spill and stating "[s]ome damage to marine life is obvious in the wake of a disaster such as the one which befell the 'Torrey Canyon.' Surface feed-

ing fishes die when they swim into floating oil. . . . The most serious consequences of oil pollution, however, may not be those which are immediately obvious. . . ." and discussing marine biologist's opinion of less obvious effects on ecosystem); *see also Pagan v. Shoney's, Inc.*, 931 F.2d 334, 339 (5th Cir.1991) (distinguishing between obvious and nonobvious damages in the general rule that "[a]n award of only nominal damages coupled with either a disregard for uncontested and obvious damages or an award of only out-of-pocket expenses raises the suspicion of a compromise verdict"). In a variety of circumstances, courts often deploy the word "speculative" to draw the boundary between sufficient and insufficient evidence of causation of damages. *See, e.g., Massachusetts v. E.P.A.*, 549 U.S. 497, 545, 127 S.Ct. 1438, 167 L.Ed.2d 248 (2007) (Roberts, C.J., dissenting) (stating he would conclude, in Article III standing analysis, that "the connection is far too speculative to establish causation"); *In re Fisher*, 640 F.3d 645, 649 (5th Cir.2011) ("The district court found that this assumption was too speculative to support a finding of but-for causation."); *Allen v. Pa. Eng'g Corp.*, 102 F.3d 194, 197 (5th Cir.1996) ("Reliance on these animal studies furnishes at best speculative support for appellants' causation theory."); *Aldon Indus., Inc. v. Don Myers & Assocs., Inc.*, 517 F.2d 188, 191 (5th Cir. 1975) ("The term 'speculative' is basically a characterization of the evidence introduced to prove [contract] damages [under Florida law]. Proof must show with reasonable certainty that the plaintiff suffered damages and that the damages flowed as the natural and proximate result of defendant's wrongful conduct." (citing *Twyman v. Roell*, 1936, 123 Fla. 2, 166 So. 215) (internal citation omitted)).

In *LUPE*, the Fifth Circuit upheld FEMA's regulations promulgated under 42 U.S.C. § 5174(j) even though they, in part, repeated some portions of the Stafford Act's text, finding that those regulations "significantly narrow[ ] the universe of potentially eligible disaster victims." *LUPE*, 608 F.3d at 223. Given the greater departure the language of the deferred-maintenance policy makes from the statute and regulations coupled with the greater substantive difference on causation and quantum of harm the language chosen makes, a finding that the deferred-maintenance policy "significantly narrows the universe of potentially eligible disaster victims" follows *a fortiori*. *Id.*

### 2. Use of the Policy

FEMA maintains that it, not its inspectors, ultimately decides whether damage is disaster-related and did not depart from that standard. The pertinent question is whether its inspectors treated the deferred-maintenance policy as a "substantive rule[ ] of general applicability . . . [or] statement[ ] of general policy or interpretation[ ] of general applicability" when making eligibility decisions. 5 U.S.C. § 552(a)(1)(D). The undisputed evidence in the administrative record, however, does nothing to refute the conclusion that inspectors and FEMA employees alike considered or employed the deferred-maintenance policy when deciding all applications during DR1780. Carleton Decl. ¶ 6 ("certify[ing] that the administrative record . . ., to the best of my knowledge, information and belief, constitutes the materials considered or otherwise employed by FEMA as a part of the decision-making processes relating to the claims asserted by the plaintiff [sic] in [this case]"). Indeed, FEMA points to no materials considered or employed by its employees not available to inspectors. *See* Def.'s Mem. Supp. Mot. Summ. J. 21 & n. 6 (arguing only that FEMA retains decision-making authority). Nor does it argue that disaster-specific guidance it promulgated for Hurricane Dolly departed from the de-

ferred-maintenance policy. *Compare* A.R. 504–05 *with* A.R. 524 (stating in Hurricane Dolly guidance document that "[f]or the purpose of disaster housing inspections the term 'Deferred Maintenance' will be applied to any real property item that has been neglected and was not damaged by the disaster"); *see. also* A.R. 514 ("Please use standard comments where possible. Use this screen *for the comments required in the guidelines.*" (emphasis added)).

In its Field Inspector Manual, FEMA told inspectors that "[i]n determining an applicant's eligibility, FEMA relies on the inspector's reasoned judgment as to whether an applicant's home has been made unlivable by a disaster. You make this habitability call in the Home Status field in the . . . Tablet [computer]" during an inspection. A.R. 383; *accord id.* at 384 ("you make the overall habitability call"). The administrative record confirms this. As the language of the deferred-maintenance policy makes clear, FEMA told inspectors to check a box for each area of deferred maintenance while using a tablet computer to complete an inspection report. A.R. 504 (telling inspectors not to list areas in real property line items); *see also* A.R. 327, 502 (all real-property damage affecting living space recorded as line items); S.A.R. 136:8–138:18. The inspector's report makes its way electronically to a central computer system operated by FEMA called NEMIS. A.R. 597 ("When the inspections are completed each day, the inspectors upload them via modem back to the Inspection Contractor host computers. The host operators review the completed inspections for accuracy and completeness and then pass them along to FEMA . . . for final review and eligibility determinations."); A.R. 424 ("The inspection is then returned to FEMA for processing and eligibility determination."). NEMIS has a human services module and a manual claims-processing queue; the NEMIS software presented deferred-

maintenance boxes checked by the inspector as simple yes-or-no checkboxes to a user reviewing the inspection report. *See* A.R. 431 (showing screenshot of manual determination queue); A.R. 305 (noting that all appeals are processed in a manual-processing queue); A.R. 320. The record also includes evidence from which it can be inferred that the NEMIS system automatically determined benefits eligibility using business rules created by FEMA in over 90% of Hurricane Dolly inspections. *See* A.R. 535 ("Based on all of the criteria above, NEMIS makes a determination about eligibility, generates the appropriate payment for eligible items, and generates a letter explaining the award."); A.R. 597 ("Eligibility may be auto-determined in NEMIS"); A.R. 317 (describing options states have to work with FEMA in disasters and listing "[a]uto-determination will be used for Eligible and Ineligible determinations for [household assistance] . . ." as first bullet point when disaster is managed in NEMIS); S.A.R. 54: 16–21; *see also, e.g.,* A.R. 31, 33, 254, 256, 257, 26 1 (discussing contents and efficiency of NEMIS business rules in IHP program). FEMA does not dispute Plaintiffs' assertion that NEMIS automatically generated determination letters when inspectors checked deferred-maintenance boxes, Dkt. No. 119–1 at 20 (ultimately citing A.R. 535 via Stmnt. Undisputed Facts ¶ 209). Viewed in the light most favorable to Plaintiffs, it is reasonable to infer that the business rules with which FEMA programmed NEMIS implemented the deferred-maintenance policy as described, making the inspector's decision based on that policy effectively dispositive of the issue in at least 90% of Hurricane Dolly applications where the inspector checked a deferred-maintenance box. *See* S.A.R. 217: 14–218:12 (testimony of FEMA's Federal Rule of Civil Procedure 30(b)(6) representative attributing over 50% of

Hurricane Dolly's 14,900 housing assistance denials by September 3, 2008, to deferred maintenance).

FEMA reserves the right to review inspections manually to exercise its judgment about eligibility, or for other reasons, A.R. 451; *see also* A.R. 305; S.A.R. 154: 16–156: 14 (discussing reasons why FEMA reviews manually); *but see* A.R. 496 (showing review screen and stating that applicant ineligible if inspector judges deferred maintenance to be cause of damage and checks roof box when documenting inspection); A.R. 348 (same result with same data entry). Also, FEMA employees compare appeal inspections with the original inspection one line item at a time, but nothing in FEMA's documents regarding the comparison process suggests that the deferred-maintenance policy should be disregarded during the comparison. *See* S.A.R 97:5–98:6 (confirming that inspectors on appeal expected to follow same standard and record deferred maintenance where it is found); S.A.R. 3827 (email stating that inspector is required to record deferred maintenance on appeal); *see also* A.R. 528 ("Appeal inspections-Perform a complete inspection, including re-verifying all documentation, real property, and personal property that was addressed or omitted on the initial inspection."); A.R. 665–66 ("The procedure for an initial inspection and an appeal inspection is the same," but appeal inspector has access to original inspection data.). Amplifying its argument, FEMA points out that its employees could review comments left by an inspector during Hurricane Dolly.[10] *See* A.R. 431. Notes from an inspectors' supplemental briefing conducted August 1, 2008, reflect that FEMA "[s]tressed [to inspectors working on Hurricane Dolly inspections the] importance of comments to support the habitability call when the specs are borderline." A.R. 510. Nowhere, however, does FEMA suggest that its employees departed from the definitions found in the deferred-maintenance policy when manually reviewing applications for Hurricane Dolly disaster relief.[11] *See* Carlton Decl. ¶ 6.

### 3. Application of Controlling Law

Based on the foregoing, the Court determines that the deferred-maintenance policy "represents a ... long established and consistent [FEMA] practice that substantially affects the regulated," that is, applicants for disaster relief under the HIP. *Shell Offshore, Inc.*, 238 F.3d at 630 (holding an unwritten practice meeting this definition had to be published in the Federal Register). FEMA did not announce the deferred-maintenance policy in an adjudication. *See Tearney*, 868 F.2d at 1453–54. To the contrary, FEMA follows the policy with several examples of its application to specific facts, implying that the policy states a general rule which must be used

---

**10.** Plaintiffs assert that "[w]hen inspectors enter standardized ('canned') comments, FEMA computers can use these standardized comments to 'auto-determine' eligibility. When inspectors enter comments that are not standardized, the comments cannot be used to decide eligibility unless a FEMA employee manually reviews the application." Stmnt. Undisputed Fact ¶ 188. While the material cited encourages use of standard comments and mentions standard letters, *see* A.R. 514, 528, it does not confirm that standard comments can be used to generate eligibility determinations. As explained in the text of the previous paragraph, the Court must treat as undisputed the fact that choosing a deferred-maintenance checkbox leads automatically a denial.

**11.** To control quality, FEMA directs its inspection contractors to reinspect a random sample of 3% of applicants' homes. A.R. 278. A FEMA inspector is present during the reinspection. A.R. 278. Again, nothing in the record suggests that the deferred-maintenance policy is not considered or employed during reinspection.

to address specific facts. *See* A.R. 504–07. While FEMA may apply the standard articulated in the deferred-maintenance policy to specific facts when adjudicating applications, *see Tearney,* 868 F.2d at 1453, FEMA identifies no evidence in the record showing that it varies from the standards of the deferred-maintenance policy when adjudicating an application. As a result, and unlike the handbook in *Nguyen v. United States,* 824 F.2d 697, 702 (9th Cir. 1987), the deferred-maintenance policy, could most accurately be characterized as establishing "mechanical[ ] ... per se rules" in practice. It does not "operate[ ] essentially ... to trigger further agency scrutiny," for the 10% of cases scrutinized manually are seen through the deferred-maintenance policy's lens. *Id.; see also* A.R. 380 (answer describing "the one exception to the rule that FEMA will not pay for deferred maintenance repairs"). The deferred-maintenance policy's standards substantively narrow applicants' eligibility criteria from the standard of the Stafford Act and FEMA's published regulations. *See Morton,* 415 U.S. at 235, 94 S.Ct. 1055; *Shell Offshore, Inc.,* 238 F.3d at 629–30; *Davidson,* 169 F.3d at 999 ("The Handbook provision imposes conditions ... beyond those required by the regulation, thereby qualifying as a legislative rule by 'affecting individual rights' and creating new law."); *Phillips Petroleum Co.,* 22 F.3d at 619 (holding rule "effects a change in the method used by MMS in valuing [leases]"). Accordingly, the APA, 5 U.S.C. § 552(a)(1)(D), required FEMA to publish the deferred-maintenance policy, and it forbade FEMA to use that policy to affect Hurricane Dolly applicants adversely, regardless of their right of appeal. *See, e.g., Shell Offshore, Inc.,* 238 F.3d at 630 (use of unpublished policy to decide adjudication found to be § 552(a) violation adversely affecting applicant); *Davidson,* 169 F.3d at 999 (imposition of additional conditions on

receipt of benefits demonstrated applicant for benefits was adversely affected).

### B. Notice–and–Comment Rulemaking

The APA's notice-and-comment rulemaking requirements do not apply to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). As previously noted, Congress designed notice-and-comment rulemaking to "ensure that the broadest base of information [will] be provided to the agency by those most interested and perhaps best informed on the subject of the rulemaking at hand." *Phillips Petroleum Co.,* 22 F.3d at 620 (citing *Shell Oil Co. v. Fed. Energy Admin.,* 574 F.2d 512, 516 (Temp.Emer.Ct.App.1978)). After applying the appropriate legal tests, the Court determines that the deferred-maintenance policy is neither a procedural nor an interpretative rule.

#### 1. Procedural Rule

■ The Fifth Circuit uses a substantial-impact test to decide whether a rule is procedural. Under that test, "when a proposed regulation of general applicability has a substantial impact on the regulated industry, or an important class of the members or the products of that industry, notice and opportunity for comment should first be provided." *Phillips Petroleum Co.,* 22 F.3d at 620 (quoting *Brown Express, Inc. v. United States,* 607 F.2d 695, 702 (5th Cir.1979); *see also Texas v. United States,* 787 F.3d 733, 766 n. 115 (5th Cir.2015) (noting *City of Arlington v. FCC,* 668 F.3d 229, 245 (5th Cir.2012) as reaffirmed this test in the Fifth Circuit and D.C. Circuit's disagreement as recognized in *Kaspar Wire Works, Inc. v. Sect' of Labor,* 268 F.3d 1123, 1132 (D.C.Cir.2001)); *Prof'ls & Patients for Customized Care,* 56 F.3d at 596).

At the outset, the Court cannot give dispositive weight to FEMA's judgment that the deferred-maintenance policy is an interpretative or procedural rule not subject to notice-and-comment rulemaking. *See* Mem. Supp. Def.'s Mot. Summ. J. 19. The Interstate Commerce Commission advanced the same argument in *Brown Express, supra;* the Commission even placed its position in the text of the challenged notice itself. 607 F.2d at 700 ("In the Notice of Elimination itself, the Commission attempted to avoid the notice and comment requirements of the APA by characterizing its action as a 'procedural change' and 'a general statement of Commission policy.'"). The Fifth Circuit held that "[t]he label that the particular agency puts upon its given exercise of administrative power is not ... conclusive; rather, it is what the agency does in fact" with that policy that informs the inquiry. *Id.* (quoting *Lewis–Mota v. Sec'y of Labor,* 469 F.2d 478, 481 (2d Cir.1972)); *Prof'ls & Patients for Customized Care,* 56 F.3d at 596 (using same alterations and reaching same conclusion); *Phillips Petroleum Co.,* 22 F.3d at 619 ("This court, however, must determine the category into which the rule falls: '[T]he label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive....'"). FEMA's characterization of the deferred-maintenance rule as a statement of policy deserves consideration, however, for it marks "the starting point" for the Court's analysis. *Prof'ls & Patients for Customized Care,* 56 F.3d at 596. FEMA points to no statement in the training manual disclaiming its use as a legal requirement. *See id.* (finding fact that policy appeared in advisory opinion disfavored categorizing it as substantive rule where agency promulgated regulation stating that advisory opinion "may be used in administrative or court proceedings to illustrate acceptable and unacceptable procedures or standards, but not as a legal requirement" (citation omitted)). Accordingly, the Court turns to what FEMA, in fact, did with the deferred-maintenance policy.

The undisputed record evidence shows that the deferred-maintenance policy had a substantial impact on IHP applicants in the wake of Hurricane Dolly. As explained above, the deferred-maintenance policy uses mandatory language that raises the bar of causation as well as quantum of damages and weight and sufficiency of evidence. *See* A.R. 505 ("Any deferred real property damage listed in line items must have been significantly worsened by the disaster event. Disaster damages to these items *must* be significant, obvious and without question. The listing of deferred maintenance items worsened by storm *should never* be speculative." (emphasis added)). The evidence also shows that FEMA utilized deferred-maintenance standards when making eligibility determinations. *See* supra Part 2. Indeed, FEMA's briefing notes for Hurricane Dolly inspectors confirms that it told inspectors to "expect sub-standard construction [and] deferred maintenance...." A.R. 510. Each plaintiff has submitted an affidavit setting forth evidence and observations that, when viewed in the light most favorable to Plaintiffs, fall within the ordinary meaning of disaster-related, *see* S.A.R. 7787–7812, 7904–7975, yet FEMA denied all of their applications or appeals, S.A.R. 7814.

Accordingly, on this record, the deferred-maintenance policy changed the causation and weight-and-sufficiency-of-evidence standards used to decide applications. *See Texas,* 787 F.3d at 766 ("[R]ules are generally considered procedural so long as they do not 'change the substantive standards by which the [agency] evaluates' applications which seek a benefit that the agency has the power to

provide." (quoting *James v. Hurson Assocs., Inc. v. Glickman,* 229 F.3d 277, 282 (D.C.Cir.2000) (second alteration in original))); *Davidson,* 169 F.3d at 999 (holding handbook provision that denied plaintiff right to revise report from which benefits determination made if revision would be favorable to applicant affected substantial rights); *Phillips Petroleum Co.,* 22 F.3d at 621 (holding policy paper that narrowed factors agency considered when making valuation determination was substantive). As FEMA argues, the applicants for IHP assistance after Hurricane Dolly had an incentive to provide FEMA with evidence that damage was disaster-related within the ordinary meaning of that term, *see, e.g.,* A.R. 512 (directing Hurricane Dolly inspectors to ask applicants whether they suffered disaster-related damage at primary residence), but applicants had no way of knowing—and the FEMA inspectors did not ask them—that they needed to identify evidence showing that disaster-related damage was also, for example, "significant, obvious, and without question." A.R. 505. Assuming that notice had been given of the deferred-maintenance standards, it is reasonable to infer on this record that more applicants would have submitted evidence probative of the standards FEMA in fact applied, altering the outcomes for applicants. *Cf. Brown Express,* 607 F.2d at 702 (finding policy affected substantial rights by hypothesizing effect on revenues of regulated industry had notice been given: "[i]f we assume notification would have supplied the information eventually obtained, the failure to have that information when first deciding these petitions affected substantial amounts of revenue in the motor carrier industry").

### 2. Interpretative Rule

■ " '[R]egulations,' 'substantive rules,' or 'legislative rules' are those which create law; whereas interpretative rules

are statements as to what the administrative officer thinks the statute or regulation means." *Shell Offshore, Inc.,* 238 F.3d at 628 (quoting *Brown Express,* 607 F.2d at 700). As the Fifth Circuit recently reiterated, "[a]n agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption for such rules of agency procedure cannot apply." *Texas,* 787 F.3d at 765–66 (quoting *United States Dep't of Labor v. Kast Metals,* 744 F.2d 1145, 1153 (5th Cir.1984)) (other citation omitted). This test "focus[es] primarily on whether the rule has binding effect on agency discretion or severely restricts it." *Texas,* 787 F.3d at 763 (quoting *Prof'ls & Patients for Customized Care,* 56 F.3d at 595).

The undisputed evidence demonstrates that the deferred-maintenance policy at least severely limits discretion to grant disaster relief to HIP applicants. The deferred-maintenance policy does not purport on its face to set forth a FEMA officer's opinion about what the regulations mean or define a term in the Stafford Act or regulations. *See* 42 U.S.C. § 5174 (West 2015); (nowhere using phrase "deferred maintenance"); 44 C.F.R. § 206.110–20 (2008) (same); A.R. 499 (listing no author); *see also, e.g., Phillips Petroleum Co.,* 22 F.3d at 619 ("[T]he Procedure Paper is not a mere clarification. It defines no ambiguous term. It gives no officer's opinion about the meaning of the statute or regulations."). Though FEMA argues without specific citation that its materials expressly acknowledge inspectors and FEMA employees' discretion to determine what damage is disaster-related, Mem. Supp. Def.'s Mot. Summ. J. 20, a challenged agency document may "exude[ ] discretion ... [, b]ut ... be binding if it is 'applied by the agency in a way that indicates it is binding.' " *Texas,* 787 F.3d at 764 (internal footnotes and citation omitted). As already explained, the deferred-

maintenance policy uses mandatory language. *See* A.R. 504–05; *Texas*, 787 F.3d at 764 (noting with approval district court's reliance on "mandatory language in the ... Memo" to support conclusion that memo was not interpretative rule); *Brown Express*, 607 F.2d at 702 n. 6 (finding rule substantive in part based on manual provision stating "[f]or example, the Manual provides in P 1(d): 'The Field Staff must determine whether existing motor carriers have the authority to provide the service" (emphasis deleted)).

Turning from the face of the policy to how FEMA uses it in reality, the undisputed evidence also demonstrates that the deferred-maintenance policy affects applicants' substantial rights. FEMA describes the policy as "an approach to applying the general rule." Mem. Supp. Def.'s Mot. Summ. J. 20. In other words, the deferred-maintenance policy chooses from among available methods for identifying disaster-related damage and, by so choosing, "effects a change in the method used ... in granting substantive rights." *Brown Express*, 607 F.2d at 700; *accord. Davidson*, 169 F.3d at 999. FEMA offers no example of an application it granted in its discretion even though the evidence of damage did not satisfy the definition of "deferred maintenance" in the policy. A.R. 504–05.

The evidence establishes a positive correlation between deferred maintenance reports and denials. FEMA recorded deferred maintenance in 24,027 of the 39, 689 Dolly inspections. S.A.R. 1044; *see also* Stmnt. Undisputed Facts ¶ 184 and sources cited therein. FEMA's Federal Rule of Civil Procedure 30(b)(6) representative confirms that "most" of the 14,900 applications denied as ineligible due to insufficient damage were based on deferred maintenance. *See* S.A.R. 223:17–224:1; S.A.R. 2962–76; S.A.R. 204:7–21; S.A.R. 232: 10–12; S.A.R. 3246–47. As explained

above, FEMA automatically determined 90% of Hurricane Dolly applications based on business rules that made ineligibility the outcome when the inspector reported deferred maintenance. FEMA considered the denial rate for Hurricane Dolly unusually high. *Compare* S.A.R. 2962 (6% denial rate of IHP is ordinary) *with* S.A.R. 2975 (14,900 denials as of Sept. 3, 2008, yielding approximately a 50% denial rate). FEMA, however, did not reevaluate those inspections, and it is reasonable to infer, therefore, that it treated the deferred-maintenance determination as essentially binding. *See* S.A.R. 219:2–222:6. Indeed, FEMA directed that appeal inspections not be ordered when deferred maintenance to a Hurricane Dolly applicant's roof was recorded. S.A.R. 3060; A.R. 528. That is, eligibility decisions, based on entry of "deferred maintenance" as the phrase was defined for inspectors by the policy, stood without a second look. *See id.* Thus, it is reasonable to infer from the unusually high rate of reported deferred maintenance correlated with increased denial rates that FEMA treated the deferred-maintenance policy as a binding norm that determined eligibility outcomes. *See Texas*, 787 F.3d at 763 (noting district court's inference that policy did not limit discretion where 95% of applications granted under policy); *Phillips Petroleum Co.*, 22 F.3d at 620–21 (holding procedure paper imposed "binding valuation criteria" and concluding that paper was substantive rule because "[t]his change in valuation technique dramatically affects the royalty values of all oil and gas leases"). Again, FEMA identifies no application in which it exercised its discretion to determine that damage not meeting the policy's definition of deferred maintenance was disaster-related.

 "An agency that, as a practical matter, has enacted a new substantive rule

cannot evade the notice and comment requirements of the APA by avoiding ... 'official' interpretations of a given regulation." *Shell Offshore, Inc.*, 238 F.3d at 630. The Court concludes that § 553 required the deferred-maintenance policy to be adopted by notice-and-comment rulemaking.

## VI. Conclusion

Based on the foregoing analysis and the undisputed facts, the Court determines that FEMA used an unpublished definition of deferred maintenance which substantively altered the weight and sufficiency of evidence of damage and degree of causation that had to be shown to prove that damage was disaster-related and thus potentially remunerable under FEMA's regulations. The Court further determines that FEMA used that policy to affect Hurricane Dolly applicants, including the individuals named as plaintiffs in this case, adversely. Finally, the APA required the policy to be adopted using the notice-and-comment rulemaking process because the policy affected applicants' substantive rights and was neither an interpretative nor procedural rule. The Court, however, does not reach the remainder of the purported policies Plaintiffs challenge today, finding that FEMA should have an opportunity to respond to Plaintiffs' arguments for the reasons already stated. As such, the Court will not now take up the question of what the proper remedy is.[12]

Accordingly, the Court GRANTS IN PART Plaintiffs' motion for summary judgment, Dkt. No. 119–1, and DENIES FEMA's motion for summary judgment, Dkt. No. 118. The Court GRANTS IN PART and DENIES IN PART Plaintiffs' motion to supplement the administrative record, Dkt. No. 121, and their motion for

---

12. The Court implies no view on the merits of any of Plaintiffs' other contentions made in

leave to exceed page limits, Dkt. No. 119, as stated herein. The Court directs the parties to confer and file, within fourteen days, a proposed plan for further proceedings in light of this decision.

It is so ORDERED.

